[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-11421

_____

D.C. Docket No. 4:13-cv-00160-CDL


MAXI DINGA SOPO,

                                                  Petitioner-Appellant,

versus

U.S. ATTORNEY GENERAL,
SECRETARY, U.S. DEPARTMENT OF HOMELAND SECURITY,
ICE FIELD OFFICE DIRECTOR, ATLANTA REGION,
STEWART DC WARDEN,

                                                  Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

(June 15, 2016)

Before HULL and JILL PRYOR, Circuit Judges, and CONWAY,[*] District Judge.

HULL, Circuit Judge:

From 2004 to 2010, Maxi Dinga Sopo resided lawfully in the United States as an asylee from Cameroon. In 2010, he pled guilty to bank fraud and became removable as an aggravated felon. After Sopo completed his criminal sentence, U.S. Immigration and Customs Enforcement ("ICE") took custody of him. Since February 2, 2012, Sopo has been in ICE detention, pursuant to 8 U.S.C. § 1226(c), which mandates civil detention for certain criminal aliens during their removal proceedings. His removal proceedings continue before the Board of Immigration Appeals ("BIA") today. During the past four years in ICE custody, Sopo has never had a bond hearing.

In 2013, Sopo filed a 28 U.S.C. § 2241 petition for a writ of habeas corpus, requesting a bond hearing. Sopo claimed his mandatory detention, without even a bond hearing during his protracted removal proceedings, raised serious concerns about the constitutionality of the § 1226(c) detention statute as applied to his case. The district court dismissed his petition on the basis that § 1226(c) provides that detention is mandatory for aggravated felons during the entirety of their removal proceedings.

---

[*]Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

In this appeal, we address an issue of first impression in this circuit. During their removal proceedings, are criminal aliens, like Sopo, detained under § 1226(c) entitled at any point to a bond hearing under the Due Process Clause?

All other circuits reaching this issue have concluded that the mandatory civil detention of criminal aliens under § 1226(c) is constitutional for a reasonable period of time to complete the removal proceedings, but as a matter of constitutional avoidance, at some point such detained aliens become entitled to an individualized bond hearing. The circuits are split, however, as to when this occurs.

Our analysis of this issue proceeds in nine parts. We recount Sopo's: (1) personal background; (2) protracted removal proceedings; and (3) federal habeas case. We then discuss (4) the federal statutory framework governing the civil detention of criminal aliens and (5) Supreme Court decisions analyzing the constitutionality of immigration detention statutes, which leads us to conclude, as a matter of constitutional avoidance, that § 1226(c) contains an implicit temporal limitation against the unreasonably prolonged detention of criminal aliens without an individualized bond hearing. After reaching this holding, we (6) establish an approach for determining when the removal proceedings and the resulting § 1226(c) mandatory detention of a criminal alien become unreasonably protracted, triggering the need for a bond hearing. We also (7) settle on a mechanism the

3

government must follow to give that detained criminal alien a bond hearing. Finally, we (8) apply our holdings to Sopo's case and (9) conclude that he must receive an immediate bond hearing as habeas relief.

## I.  BACKGROUND

Sopo's immigration case is not before us and remains pending in separate proceedings now before the BIA.  Sopo has been before the immigration judge ("IJ") and BIA three times, and his case is once again before the BIA for a fourth round of review.  In this part and the next, we describe Sopo's removal proceedings and criminal conviction, as they provide the backdrop for his mandatory detention that has lasted four years.

### A.    Asylum Application and Interview

Sopo is a native and citizen of Cameroon and a member of the Bali tribe.  In May 2003, Sopo fled from his home country to the United States.  After he arrived in the United States, Sopo applied for asylum based on his political affiliations. On August 23, 2004, the United States Citizenship and Immigration Services ("USCIS") granted Sopo's application for asylum.

In his application and the asylum interview, Sopo explained that he had held leadership positions in the Bali Catholic Youth Association ("BCYA") and the Southern Cameroons National Council ("SCNC").  In 2000, Sopo was arrested during an SCNC event.  The police took his clothes and starved and beat him.  At

4

least twice a day, the police hung him upside-down from a metal pole, strapped electrical nodes to his feet, and shocked him with increasing voltage.

After about a week of imprisonment, Sopo "went into shock." The police abandoned him at a hospital, where he stayed for two weeks. Later in 2000, the police arrested Sopo's mother, and starved, beat, and raped her in an attempt to get information about Sopo. She got out of prison by signing a pledge to give Sopo to the authorities.

In March 2002, Sopo was arrested during a BCYA meeting. The police beat him, caned him, made him drink his own urine, and told him he would never leave prison until he renounced his SCNC and BCYA activities. After about a week, Sopo became ill and was released to go to the hospital. In September 2002, the police raided Sopo's house, arrested him again, and kept him in prison for two months. He faced more beatings during that stay.

In January 2003, Sopo obtained an American visa under his real name, but police officers at the airport refused to let him leave Cameroon because there were outstanding warrants against him. He then obtained a visa under a false name and left Cameroon in May 2003. After obtaining asylum in 2004, Sopo settled in Seattle, Washington, with his wife, who left Cameroon with him, and their daughter, who was born in the United States shortly after their arrival.

5

**B.    Criminal Charges**

In March 2008, Sopo began assisting people in obtaining loans to buy used cars.  Sopo planned for the loan applicants to use the cars in connection with his business.  In order to obtain the loans, Sopo instructed the applicants to include false information about their employment and salary.  At least four people obtained car loans at Sopo's instruction.

While federal prosecutors were investigating the loans, Sopo traveled to Cancun, Mexico, purportedly for vacation.  A warrant issued while he was there, and Mexican authorities arrested him.  In April 2010, Sopo was extradited to the United States.  The next month, he signed a plea agreement and pled guilty to four counts of bank fraud.  In August 2010, the district court sentenced him to serve 33 months' imprisonment and pay $147,249.92 in restitution.

Sopo served some portion of his federal sentence at a prison in Georgia.  On January 17, 2012, ICE served him with a notice to appear ("NTA"), alleging that his bank-fraud convictions were aggravated felonies that made him removable under 8 U.S.C. § 1227(a)(2)(A)(iii).

## II.  REMOVAL PROCEEDINGS

**A.    Initial Hearings and December 19, 2012 IJ Decision**

On February 2, 2012, ICE transferred Sopo to an immigration detention facility in Georgia.  At a February 13, 2012 master calendar hearing, Sopo

6

appeared pro se, and the IJ adjourned to give him more time to obtain legal counsel, as well as to allow the government to file an amended NTA.

At the February 27, 2012 master calendar hearing, Sopo informed the IJ that he did not receive the government's amended NTA in time to discuss the charges with an attorney. The IJ granted him a second continuance.

At the March 14, 2012 master calendar hearing, Sopo, pro se, conceded the charge of removability. Sopo announced his intent to apply for withholding of removal and relief under the United Nations Convention Against Torture ("CAT").[1] The IJ provided him with the necessary application forms.

During the April 16, 2012 hearing, Sopo stated that he instead wanted to resubmit his 2004 asylum application to serve as his request for withholding of removal and CAT relief. Sopo stated that he did not have a copy of the prior application because the government had not yet responded to his Freedom of Information Act ("FOIA") request. The IJ set a deadline for Sopo to file a copy of the prior asylum application, and also ordered the parties to brief whether Sopo was eligible for a waiver under Immigration and Nationality Act ("INA") § 209(c), 8 U.S.C. § 1159(c) (a "§ 209(c) waiver"), and adjustment of status.

---

[1]When we use the term "CAT relief," we are referring to deferral of removal under the CAT. When we use the term "withholding of removal," we are referring to withholding of removal under the INA. We choose these terms to avoid unnecessarily complicating our discussion of Sopo's immigration proceedings, when his § 2241 petition is the subject of this opinion.

At the May 16, 2012 hearing, Sopo filed an application for a § 209(c) waiver and adjustment of status. During a May 31, 2012 hearing, the government filed its response. As Sopo was still waiting on his FOIA request, the IJ adjourned the hearing.

At a June 21, 2012 hearing, Sopo was still without his FOIA documents, and the government refused to file a copy of Sopo's previous asylum application to expedite the case. The IJ ordered Sopo to file a completed asylum application by June 28, 2012—regardless of whether he received the FOIA documents.

At the June 28, 2012 hearing, Sopo stated that he would not file a new asylum application because the IJ did not have the authority to make him fill out a second form when the first one was in his file. Consistent with prior warnings, the IJ responded by deeming Sopo's claims to withholding of removal and CAT relief abandoned, and scheduled a hearing on Sopo's application for a § 209(c) waiver and adjustment of status.

Before the next hearing, however, the IJ recused himself and transferred the case to a new IJ. At an August 6, 2012 master calendar hearing, the new IJ continued the case until September 6, 2012, to provide Sopo with more time to receive the FOIA documents. By September 6, 2012, Sopo had received his FOIA documents, including his prior asylum application, and he filed them during the September 6 hearing.

8

On November 2, 2012, the IJ held a merits hearing on Sopo's application for a § 209(c) waiver and adjustment of status, and reconvened on November 30, 2012 to further question Sopo.

On December 19, 2012, the IJ issued a written decision. The IJ indicated that, despite the previous IJ's abandonment ruling, she had decided to consider Sopo's 2004 asylum application as a request for withholding of removal and CAT relief. The IJ found that Sopo was a credible witness, but denied withholding of removal, CAT relief, and adjustment of status with a § 209(c) waiver, and ordered Sopo's removal to Cameroon.

## B.    First Appeal to BIA and October 23, 2013 Remand

Sopo appealed to the BIA. In an October 23, 2013 opinion, the BIA noted, as a threshold matter, that the IJ had failed to terminate Sopo's asylee status. The BIA ordered a remand and instructed the IJ to determine, in the first instance, whether Sopo's asylee status should be terminated.

The BIA advised that, if the IJ terminated Sopo's asylee status, the IJ would also need to re-examine CAT relief and could choose to "revisit her findings regarding whether the respondent merits a waiver under section 209 as a matter of

9

discretion, taking into account her updated findings" on CAT relief.  The BIA

affirmed the denial of withholding of removal.[2]

## C.    Hearings on Remand and March 5, 2014 IJ Decision

At the December 5, 2013 hearing on remand, the IJ ordered briefing on

whether Sopo's asylee status should be revoked.

During a January 9, 2014 hearing, the government filed (1) the sworn

statement of Nicky Church of the United Kingdom ("UK") Border Agency of the

Home Office; and (2) a motion alleging that Sopo was in the UK at points in 2000

and 2002, which contradicted key statements in Sopo's original asylum

application.  In her statement, Church indicated that Sopo's fingerprints matched

the fingerprints of a Cameroonian national who was arrested in the UK at various

times in 2000 and 2002.

At the January 16, 2014 hearing, Sopo submitted evidence, and the

government filed a formal USCIS notice of intent to terminate Sopo's asylee

status.  At the January 23, 2014 hearing, Sopo presented additional evidence.  On

February 10, 2014, the IJ held a merits hearing.

---

[2]Typically, when an alien cannot establish grounds for withholding of removal under the INA, the alien cannot obtain any form of CAT relief, as proving torture under the CAT is harder than proving persecution under the INA.  Sopo, however, was barred from obtaining withholding of removal—under the INA and the CAT—due to the nature of his crimes.  But he remained eligible for deferral of removal under the CAT.  This seems to explain how the BIA, in Sopo's case, affirmed the denial of withholding of removal, while deciding that the CAT claim required further merits review.

On March 5, 2014, the IJ issued a written decision, which terminated Sopo's asylee status, denied CAT relief, and reaffirmed the previous denial of Sopo's application for a § 209(c) waiver and adjustment of status. The IJ found that Sopo was not a credible witness based on the Church statement and other related new evidence showing that he was not in Cameroon in 2000 and 2002. Based on the adverse credibility finding, the IJ denied Sopo's CAT claim and declined to revisit her previous decision denying a § 209(c) waiver and adjustment of status.

## D.    Second Appeal to BIA and August 22, 2014 Remand

Sopo appealed the IJ's decision to the BIA a second time. Sopo argued that the IJ failed to rule on the admissibility of the Church statement before adding it to the record and that a remand was necessary to avoid a due process violation.

On August 22, 2014, the BIA remanded Sopo's case to the IJ. It held that the IJ properly terminated Sopo's asylee status, but erred in relying on the Church statement to deny CAT relief. The BIA stated that Sopo should have been afforded an opportunity at his hearings to examine and object to the government's evidence.

## E.    Hearings on Remand and February 25, 2015 IJ Decision

On October 8, 2014, the parties appeared on remand in a different immigration court. The presiding IJ determined that the case should be transferred back to the IJ who entered the decision that the BIA reviewed. On November 6, 2014, the parties appeared for calendaring before the proper IJ.

11

At a December 1, 2014 hearing, Sopo filed a motion requesting to cross-examine Church and, alternatively, contended that her signed statement was inadmissible and fraudulent.  At a January 13, 2015 merits hearing, Sopo explained why the Church statement was fabricated and premised on forged documents.

On February 25, 2015, the IJ issued a written decision denying CAT relief for the third time.  The IJ determined that the Church statement was admissible, but gave it little weight because the government failed to carry its evidentiary burden of showing why Church was unavailable to testify at the merits hearing.  As a result, the IJ rescinded her previous determination and concluded that Sopo was credible.  Nevertheless, the IJ found that Sopo had still failed to show that he was entitled to CAT relief.

### F.    Third Appeal to BIA and August 3, 2015 Affirmance

Sopo's third appeal to the BIA argued that the IJ erred in (1) denying his CAT claim and (2) failing to reconsider the denial of his application for a § 209(c) waiver and adjustment of status, in light of the changed credibility finding.

In an August 3, 2015 order, the BIA affirmed Sopo's order of removal.  The BIA determined that: (1) Sopo had not shown that he qualified for CAT relief; and (2) the § 209(c) waiver and adjustment of status request were not properly before the BIA, as the IJ had followed the BIA's instructions after the first remand and denied the waiver "as a matter of discretion."

12

### G.    Petition for Review Before this Court

On August 10, 2015, in this Court, Sopo filed a petition for review and a motion for stay of removal.  On September 14, 2015, over the government's opposition, this Court granted Sopo's motion for a stay of removal.

Partway through briefing on the petition for review, the government filed a motion to remand Sopo's case to the BIA.  The government conceded that the BIA had applied an erroneous legal standard in affirming the IJ's denial of CAT relief, and had further erred by failing to consider whether the IJ needed to reconsider her denial of the § 209(c) waiver and adjustment of status now that she found Sopo credible again.

On February 2, 2016, this Court granted the government's motion, vacated the BIA's order, and remanded the case to the BIA for further proceedings on Sopo's applications for CAT relief and a § 209(c) waiver and adjustment of status.

## III.  SECTION 2241 PETITION

In May 2013, against the backdrop of his ongoing administrative removal proceedings, Sopo filed a pro se § 2241 petition in the district court.  Sopo alleged that he had never had a bond hearing during his then-16 months of ICE detention that began on February 2, 2012.  He argued that his continued mandatory detention without a bond hearing violated the Due Process Clause.  Sopo requested a bond hearing or immediate release from detention.

The government filed a motion to dismiss, claiming that Sopo's continued detention without a bond hearing was not unlawful because § 1226(c) squarely prohibits the release of criminal aliens, like Sopo, during the entirety of the removal proceedings.

A magistrate judge issued a report and recommendation ("R&R"), recommending dismissal of the § 2241 petition. The magistrate judge concluded that § 1226(c) made Sopo's custody mandatory, the Supreme Court upheld the statute's constitutionality in Demore v. Kim, 538 U.S. 510, 123 S. Ct. 1708 (2003), and Sopo's claim was meritless.

The district court overruled Sopo's objections to the R&R, adopted the magistrate judge's R&R, and dismissed Sopo's § 2241 petition. Sopo filed a timely notice of appeal. On appeal, we appointed counsel for Sopo.

## IV.  STATUTORY FRAMEWORK

We first describe the relevant statutes in 8 U.S.C. §§ 1226 and 1231 to compare how Congress has constructed different, though noticeably interrelated, frameworks for detaining criminal and non-criminal aliens.[3]

---

[3]When we use the term "criminal aliens," we refer to the subset of aliens who have committed serious enough crimes to fall under the provisions of § 1226(c). This includes crimes of moral turpitude, controlled substance offenses, aggravated felonies, certain firearm offenses, human trafficking, and crimes relating to national security and terrorism. See INA § 236(c)(1); 8 U.S.C. § 1226(c)(1). When we use the term "non-criminal aliens," we refer to all aliens who have not committed any of these § 1226(c) predicate offenses.

Section 1226 authorizes the detention of aliens <u>during the removal</u>
<u>proceedings</u>.  While § 1226(a) controls <u>non-criminal</u> aliens' detentions, § 1226(c)
controls <u>criminal</u> aliens' detentions.  <u>See</u> INA § 236(a), (c), 8 U.S.C. § 1226(a),
(c).  Once an alien's removal proceedings are completed, ICE's detention authority
shifts to § 1231, which also distinguishes between <u>non-criminal</u> and <u>criminal</u>
aliens.  <u>See</u> INA § 241, 8 U.S.C. § 1231.

Understanding these statutes is key to reading the two major Supreme Court
cases about immigration detention and to our deciding this case.

**A.      Section 1226(a) and Non-Criminal Aliens During Removal Proceedings**

The Attorney General has the discretion to detain a <u>non-criminal</u> alien
"pending a decision on whether the alien is to be removed from the United States."
INA § 236(a), 8 U.S.C. § 1226(a).  The Attorney General may detain the alien for
the duration of the removal proceedings, or release the alien on bond or conditional
parole.  INA § 236(a)(1)-(2), 8 U.S.C. § 1226(a)(1)-(2).  The Attorney General's
decision regarding detention, bond, or parole is not reviewable by the courts.  INA
§ 236(e), 8 U.S.C. § 1226(e).

In connection with § 1226(a), the Department of Homeland Security
("DHS") promulgated regulations setting out the process by which a non-criminal
alien may obtain release.  The regulations provide that, in order to obtain bond or
conditional parole, the "alien must demonstrate to the satisfaction of the [decision

15

maker] that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."  8 C.F.R. § 1236.1(c)(8). The District Director makes the initial custody determination, and the alien has the right to appeal an adverse decision to the IJ, and then to the BIA.  Id. § 1236.1(d)(1), (3).

**B.    Section 1226(c) and Criminal Aliens During Removal Proceedings**

Although the Attorney General has broad discretion to release non-criminal aliens during their removal proceedings, the INA limits the Attorney General's discretion in the case of criminal aliens.  In relevant part, § 1226(c) mandates that "[t]he Attorney General shall take into custody any alien who . . . is deportable by reason of having committed [an aggravated felony, among other offenses]."  INA § 236(c)(1)(B), 8 U.S.C. § 1226(c)(1)(B) (emphasis added).  Section 1226(c) provides that the Attorney General may release a criminal alien "only if" necessary for narrow witness protection purposes.  INA § 236(c)(2), 8 U.S.C. § 1226(c)(2).

Under § 1226(c), custody is mandatory for criminal aliens throughout the entirety of their removal proceedings, and there is no statutory possibility for release on bond.[4]  In that way, subsection (c) of § 1226 serves as an exception to

---

[4]The only process to which a criminal alien is entitled is a "Joseph hearing," during which the alien has the opportunity to prove that he is not subject to § 1226(c).  Demore, 538 U.S. at 514 n.3, 123 S. Ct. at 1712 n.3; see In re Joseph, 22 I. & N. Dec. 799 (1999).  The detainee may avoid mandatory detention if he establishes that he is not an alien, that he was not convicted of a predicate crime, or "that the INS is otherwise substantially unlikely to establish

16

the flexible rule in subsection (a) of § 1226 that applies to all other aliens during removal proceedings—those that do not fall into this specific subcategory by virtue of having a qualifying criminal conviction.  Compare INA § 236(a), 8 U.S.C. § 1226(a), with INA § 236(c), 8 U.S.C. § 1226(c).

Because the Supreme Court's framework for analyzing the constitutionality of immigration detention statutes turns on subtle distinctions between the types of detention at play, we examine § 1231 to understand the broader statutory scheme.

## C.    Section 1231 and the 90-Day Removal Period

Section 1231 contains a 90-day window that is called the "removal period." INA § 241(a)(1)(A), 8 U.S.C. § 1231(a)(1)(A).  Generally, "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."  Id.  But this statutory 90-day "removal period" in § 1231 does not begin until the latest of three dates:

(i)    The date the order of removal becomes administratively final.

(ii)    If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.

(iii)    If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

---

that he is in fact subject to mandatory detention."  Demore, 538 U.S. at 514 n.3, 123 S. Ct. at 1712 n.3.

17

INA § 241(a)(1)(B), 8 U.S.C. § 1231(a)(1)(B) (emphasis added).  Thus, if a court stays an alien's removal during judicial review of the alien's removal order, the statutory 90-day "removal period" does not begin until the court's final order.  See INA § 241(a)(1)(B)(ii), 8 U.S.C. § 1231(a)(1)(B)(ii).

During the 90-day "removal period," the statute mandates that "the Attorney General shall detain the alien."  INA § 241(a)(2), 8 U.S.C. § 1231(a)(2) (emphasis added).  "Under no circumstance during the removal period shall the Attorney General release [a criminal alien]."  Id.  If a criminal alien is already detained under § 1226(c) during removal proceedings, detention pursuant to § 1231 does not begin until the date the "removal period" begins, which is the latest of the three dates outlined above.

Notably, if the Attorney General is unable to remove an alien within the 90-day removal period, § 1231 differentiates between non-criminal and criminal aliens.  Compare INA § 241(a)(3), 8 U.S.C. § 1231(a)(3), with INA § 241(a)(6), 8 U.S.C. § 1231(a)(6).  If a non-criminal alien is not removed during the 90-day removal period, the Attorney General must release the non-criminal alien "subject to supervision."  INA § 241(a)(3), 8 U.S.C. § 1231(a)(3).[5]

---

[5]While under supervision, the alien must periodically appear before an immigration officer, obey written restrictions, and comply with other requirements provided for by regulation. INA § 241(a)(3), 8 U.S.C. § 1231(a)(3).

However, if the Attorney General is unable to remove a criminal alien within the 90-day removal period, she may continue detaining the criminal alien as a matter of discretion.  See INA § 241(a)(6), 8 U.S.C. § 1231(a)(6).  Section 1231(a)(6) provides that criminal aliens "may be detained beyond the removal period and, if released, shall be subject to the terms of supervision" governing non-criminal aliens not removed during the 90-day period.  Id.  Therefore, on the face of the statute, the Attorney General may detain a criminal alien indefinitely without providing an opportunity for supervised release.  See id.

In sum, the statutory framework in § 1226 and § 1231 grants the Attorney General broad discretion to release non-criminal aliens both during removal proceedings and even after a final removal order.  In stark contrast, Congress has mandated the detention of criminal aliens throughout the entire process.  We now review the Supreme Court decisions addressing the constitutionality of Congress's mandates in these statutes.

## V.  DISCUSSION

### A.    Supreme Court Decisions

In Zadvydas v. Davis, 533 U.S. 678, 688-89, 121 S. Ct. 2491, 2498 (2001), the Supreme Court addressed § 1231(a)(6), which authorizes the Attorney General to detain criminal aliens after the expiration of the 90-day removal period.  The Supreme Court applied the doctrine of constitutional avoidance and construed the

19

statute to contain an implicit temporal limitation on the Attorney General's detention of criminal aliens. Zadvydas, 533 U.S. at 682, 689, 121 S. Ct. at 2495, 2498.

This case arose after the government failed to remove petitioner Zadvydas, a criminal alien, during that 90-day removal window. Id. at 684, 121 S. Ct. at 2496. Zadvydas was born to Lithuanian parents in a displaced persons camp in Germany, and neither Germany nor Lithuania regarded him as a citizen. Id. at 684, 121 S. Ct. at 2495-96. Both countries refused to accept him from the United States, and his removal in the foreseeable future was unlikely. See id. at 684, 699, 121 S. Ct. at 2496, 2504.

The government maintained that § 1231(a)(6) allowed the Attorney General to detain Zadvydas, and similarly situated criminal aliens, indefinitely, but the Supreme Court held otherwise. See id. at 682, 689, 121 S. Ct. at 2495, 2498. The Supreme Court began by emphasizing that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty [the Due Process] Clause protects." Id. at 690, 121 S. Ct. at 2498. It also clarified that "the Due Process Clause applies to all 'persons' within the United States, including aliens." Id. at 693, 121 S. Ct. at 2500.

The Supreme Court stated that immigration proceedings and detention "are civil, not criminal, and . . . nonpunitive in purpose and effect." See id. at 690, 121

20

S. Ct. at 2499.  Under the Due Process Clause, <u>civil detention</u> is permissible only when there is a "special justification" that "outweighs the individual's constitutionally protected interest in avoiding physical restraint."  <u>Id.</u> (quotation marks omitted).  The Supreme Court could discern no special justification for indefinitely holding criminal aliens in civil detention who were not especially dangerous, and who had little chance of actually being removed.  <u>Id.</u> at 690-91, 121 S. Ct. at 2499.

The Supreme Court reiterated the rule that "[i]t is a cardinal principle of statutory interpretation . . . that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided."[6]  <u>Id.</u> at 689, 121 S. Ct. at 2498 (quotation marks omitted).  As "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem" under the Fifth Amendment's Due Process Clause, the Supreme Court determined that Congress must have included an implicit temporal limitation in § 1231(a)(6).  <u>Id.</u> at 682, 690, 699, 121 S. Ct. at 2495, 2498, 2503.  That limitation, in turn, allowed for habeas relief after the criminal alien's detention exceeded the "period reasonably necessary to secure removal."  <u>Id.</u> at 682, 699, 121 S. Ct. at 2495, 2504.

---

[6]The Supreme Court explained that the doctrine of constitutional avoidance reflects the basic assumption that Congress intends to legislate within constitutional limits.  <u>Almendarez-Torres v. United States</u>, 523 U.S. 224, 238, 118 S. Ct. 1219, 1228 (1998).

The Supreme Court further instructed that the reasonableness of the length of a criminal alien's detention should be measured "primarily in terms of the statute's basic purpose." Id. at 699, 121 S. Ct. at 2504. It provided a bright-line rule for administrative ease, and held that, after six months in post-removal-order status, if the criminal alien provides "good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." Id. at 701, 121 S. Ct. at 2505. If the government does not meet its burden, the criminal alien must be released from confinement. See id.

Two years after Zadvydas, the Supreme Court took up Demore, which examined the mandatory detention statute at issue here—§ 1226(c), which authorizes detention of criminal aliens during the entirety of the removal proceedings. Demore, 538 U.S. at 513, 123 S. Ct. at 1712. The Supreme Court distinguished the "potentially permanent" detention period at issue in Zadvydas from detention during the pendency of removal proceedings, and upheld § 1226(c) as facially constitutional. Id. at 528-29, 531, 123 S. Ct. at 1720-22 (quotation marks omitted). The Supreme Court based its holding on two factors.

First, the Supreme Court emphasized that the purpose of the mandatory detention in § 1226(c) is to prevent deportable criminal aliens from absconding and from committing more crimes before they are removed. See id. at 518-20, 527-28,

22

123 S. Ct. at 1714-15, 1719-20.  The Supreme Court explained that "Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens."  Id. at 518, 123 S. Ct. at 1714.  The evidence before Congress showed that 77 percent of removable criminal aliens were arrested at least once after their original offense and before their removal, and 45 percent were arrested multiple times.  Id. at 518, 123 S. Ct. at 1715.  On top of that, approximately 20 percent did not appear for their removal proceedings.  Id. at 519, 123 S. Ct. at 1715.

As the Immigration and Naturalization Service ("INS") was unable to identify, much less remove, criminal aliens, Congress provided for mandatory detention.  Id. at 518, 521, 123 S. Ct. at 1715-16.  The Supreme Court observed that, unlike the detention of the petitioner in Zadvydas (where it was impossible to effectuate § 1231(a)(6)'s goal of removing the criminal alien), the continued detention of petitioner Demore under § 1226(c) still served Congress's purposes, because it ensured that he would come to his removal proceedings instead of remaining at large where he could commit more crimes.  See id. at 518, 527-28, 123 S. Ct. at 1715, 1719-20.

Second, the Supreme Court stressed the length of the detention in distinguishing between § 1226(c)'s constitutionality and § 1231(a)(6)'s unconstitutionality.  It noted that there were statistics showing that, in the majority

23

of cases, a criminal alien's removal proceedings lasted less than 90 days.  Id. at 529, 123 S. Ct. at 1720.  In 85 percent of cases in which the government held the alien under § 1226(c), "removal proceedings [were] completed in an average time of 47 days and a median of 30 days.  In the remaining 15 [percent] of cases, in which the alien appeal[ed] the decision of the Immigration Judge . . . appeal [took] an average of four months, with a median time that [was] slightly shorter."  Id. at 529, 123 S. Ct. at 1721 (citation omitted).

The Supreme Court concluded: "In sum, the detention at stake under § 1226(c) lasts roughly a month and a half in the vast majority of cases in which it is invoked, and about five months in the minority of cases in which the alien chooses to appeal."  Id. at 530, 123 S. Ct. at 1721.  It found that this was a limited period of time and materially different from the indefinite detention discussed in Zadvydas.  See id. at 528, 123 S. Ct. at 1720.

Based on these critical observations, the Supreme Court held that "Congress . . . may require that persons . . . be detained for the brief period necessary for their removal proceedings," without the opportunity to argue for bond.[7]  See id. at 513, 123 S. Ct. at 1712 (emphasis added).

---

[7]The Supreme Court in Demore emphasized that Congress has broad power to legislate on immigration.  Demore, 538 U.S. at 521, 123 S. Ct. at 1716 ("In the exercise of its broad power over naturalization and immigration . . . ." (quotation marks omitted)).  However, that power is limited by the Due Process Clause.  See id. at 523, 123 S. Ct. at 1717.  The Supreme Court reasoned that these principles operate together to allow Congress to initially require the

Justice Kennedy provided the fifth vote for the majority opinion, but wrote a concurrence, which is "especially relevant" to our reading of Demore. See Pesci v. Budz, 730 F.3d 1291, 1297 n.2 (11th Cir. 2013). Justice Kennedy suggested that, though the mandatory detention of criminal aliens under § 1226(c) was facially constitutional, there was still room for as-applied challenges in unique circumstances. See Demore, 538 U.S. at 532-33, 123 S. Ct. at 1722 (Kennedy, J., concurring). His analysis was that, "since the Due Process Clause prohibits arbitrary deprivations of liberty, a lawful permanent resident alien such as respondent could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable or unjustified." Id. at 532, 123 S. Ct. at 1722 (Kennedy, J., concurring) (emphasis added). He added that, "[w]ere there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." Id. at 532-33, 123 S. Ct. at 1722 (Kennedy, J., concurring) (emphasis added).

While Demore upheld § 1226(c)'s provision mandating detention of criminal aliens during removal proceedings, it did so with a strong constitutional caveat

---

detention of criminal aliens without a specific, individualized finding that a particular alien is a danger to the community or a flight risk. See id. at 523-30, 123 S. Ct. at 1717-22.

25

about due process concerns as to continued mandatory detention where the duration of the removal proceedings is unreasonably long or delayed. Outside of Justice Kennedy's Demore concurrence, the Supreme Court has never addressed how long under § 1226(c) the government can detain a criminal alien, here an aggravated felon.

## B.    Implicit Temporal Limitation in § 1226(c)

Because Demore upheld the constitutionality of § 1226(c), the government takes the position that § 1226(c) mandates the detention of criminal aliens during their entire removal proceedings, no matter how long they last. The government ignores that this is a civil detention case and the profound liberty interest at stake. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." Zadvydas, 533 U.S. at 690, 121 S. Ct. at 2498.

Reading Demore and Zadvydas together, and as a matter of constitutional avoidance, five other circuits have rejected the government's position and construed § 1226(c) to contain an implicit temporal limitation and to authorize criminal aliens' detention, not indefinitely, but for a reasonable amount of time after which a bond hearing is necessary to fulfill the purposes of the mandatory detention statute. See Reid v. Donelan, 819 F.3d 486, 494 (1st Cir. 2016) (stressing the concept that "a categorical, mandatory, and indeterminate detention

26

raises severe constitutional concerns" in recognizing "that the Due Process Clause imposes some form of 'reasonableness' limitation upon the duration of detention that can be considered justifiable under that statute," and finding "it necessary to read an implicit reasonableness requirement into the statute"); Lora v. Shanahan, 804 F.3d 601, 606 (2d Cir. 2015) ("[W]e hold that, in order to avoid significant constitutional concerns surrounding the application of section 1226(c), it must be read to contain an implicit temporal limitation."), petition for cert. filed, 84 U.S.L.W. 3562 (U.S. Apr. 21, 2016) (No. 15-1307); Rodriguez v. Robbins, 715 F.3d 1127, 1138 (9th Cir. 2013) ("[W]e conclude that, to avoid constitutional concerns, § 1226(c)'s mandatory language must be construed to contain an implicit reasonable time limitation . . . ."  (quotation marks omitted)); Diop v. ICE/Homeland Sec., 656 F.3d 221, 231-32 (3d Cir. 2011) ("[W]e conclude that the statute implicitly authorizes detention for a reasonable amount of time, after which the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community."); Ly v. Hansen, 351 F.3d 263, 267-68, 270-71 (6th Cir. 2003) ("Therefore, we hold that the INS may detain prima facie removable aliens for a time reasonably required to complete removal proceedings in a timely manner.  If the process takes an unreasonably long time, the detainee may seek relief in habeas proceedings.").

In so holding, these circuits have acknowledged the realities of immigration detention and how the entire process of removal proceedings has lengthened. Prior to Demore, in 2001, the average time that an alien was detained while awaiting a final order of removal or release, under any statutory detention provision, was 39 days. Lora, 804 F.3d at 605. By 2003, the year of Demore, criminal aliens specifically were spending an average of 47 days in detention. See id. While the government has not provided statistics in recent years, academic researchers estimate that in 2012 the average amount of time an alien with a criminal conviction spent in removal proceedings (and likely in detention) was 455 days. See Mark Noferi, Cascading Constitutional Deprivation: The Right to Appointed Counsel for Mandatorily Detained Immigrants Pending Removal Proceedings, 18 Mich. J. Race & L. 63, 81 (2012) (relying on data from Syracuse University's Transactional Records Access Clearinghouse). This represents a dramatic increase since the Supreme Court decided Demore a decade earlier and since Congress enacted § 1226(c) in 1996. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009, 3009-585 to -87; Demore, 538 U.S. 510, 123 S. Ct. 1708.

These other circuits have concluded that Congress constitutionally can require mandatory detention during a criminal alien's removal proceedings as a general rule, but § 1226(c) may become unconstitutionally applied if a criminal

alien's detention without even a bond hearing is unreasonably prolonged.  In other words, § 1226(c) must contain an "implicit reasonable time limitation, the application of which is subject to federal court review."  Cf. Zadvydas, 533 U.S. at 682, 121 S. Ct. at 2495 (quotation marks omitted).  Construing the statute in this fashion avoids "serious doubt[s]" about the constitutionality of indefinite detention.  See id. at 689, 121 S. Ct. at 2498.  Other circuits have also concluded that this construction is "fairly possible" because Congress has not clearly demonstrated an intent to empower the Attorney General to indefinitely detain criminal aliens.  See id. at 689, 121 S. Ct. at 2498; see, e.g., Diop, 656 F.3d at 235 (stating that a court cannot interpret a statute to avoid constitutional concerns when doing so would be inconsistent with clear congressional intent, but concluding that there was no issue in this context because there was no evidence that Congress intended to indefinitely detain aliens under § 1226(c)); cf. Reid, 819 F.3d at 494 ("[C]ourts interpret statutes with the presumption that Congress does not intend to pass unconstitutional laws."  (alteration in original) (quotation marks omitted)).

Sopo's case illustrates how protracted some removal proceedings have become in recent years due, in part, to the complexity of immigration issues.  ICE's continuous mandatory detention of Sopo without a bond hearing has lasted for four years, including through two BIA remands to the IJ, and patently raises serious constitutional concerns.  Therefore, as a matter of constitutional avoidance,

29

we readily join other circuits in holding that § 1226(c) "implicitly authorizes detention for a reasonable amount of time, after which the authorities must make an individualized inquiry into whether detention is still necessary to fulfill the statute's purposes of ensuring that an alien attends removal proceedings and that his release will not pose a danger to the community." Diop, 656 F.3d at 231.  We too construe § 1226(c) to contain an implicit temporal limitation at which point the government must provide an individualized bond hearing to detained criminal aliens whose removal proceedings have become unreasonably prolonged.  See Demore, 538 U.S. at 532, 123 S. Ct. at 1722 (Kennedy, J., concurring).

We now turn to the more challenging issue of discerning the trigger point at which a detained criminal alien's removal proceedings and concomitant mandatory detention become unreasonably prolonged, triggering the need for an individualized bond hearing.

## VI.  TRIGGER POINT

### A.    Approaches of Other Circuits

Courts throughout the country have adopted one of two general approaches for evaluating when a criminal alien's due process rights are violated by mandatory civil detention without a bond hearing under § 1226(c).  We refer to these as the "bright-line" and "case-by-case" approaches.

The Second and Ninth Circuits use the bright-line approach. The Ninth Circuit requires that, at the six-month mark, the government shall provide all criminal aliens detained under § 1226(c) with a bond hearing. See Rodriguez v. Robbins, 804 F.3d 1060, 1065, 1079-81 (9th Cir. 2015), petition for cert. filed sub. nom., Jennings v. Rodriguez, 84 U.S.L.W. 3562 (U.S. Mar. 25, 2016) (No. 15-1204). The Second Circuit also adopted the six-month rule, reasoning that it eliminates "inconsistency and confusion" and ensures that "similarly situated detainees receive similar treatment." Lora, 804 F.3d at 614-16.

At the bond hearing stage, the Ninth Circuit requires the government to "prove by clear and convincing evidence that [a criminal] alien is a flight risk or a danger to the community to justify denial of bond." Rodriguez, 804 F.3d at 1087 (quotation marks omitted). The Second Circuit requires the government, at the bond hearing before an IJ, to carry the burden of proof to establish by clear and convincing evidence that the criminal alien is a flight risk or a danger to the community. Lora, 804 F.3d at 616.

For the case-by-case approach, we look to the First, Third, and Sixth Circuits, which have rejected a bright-line rule and held that whether detention of a criminal alien has become unreasonable depends on the factual circumstances of the case. Those courts have held that, because each criminal alien's removal proceedings raises a unique set of facts and issues, making the length of the

31

proceedings unpredictable, it would be unwise to set a universal or bright-line timeline for when mandatory detention shifts from being reasonable to unreasonable. See Reid, 819 F.3d at 496 (rejecting a bright-line six-month rule on multiple grounds, including the fact that the Zadvydas six-month period "was predicated on there being no foreseeable hope of removal," the detention was "potentially permanent," and "there were simply no metrics by which to judge just how much longer towards eternity could be considered 'reasonable,'" warranting a bright-line rule (quotation marks omitted)); Diop, 656 F.3d at 232-33 (noting that the inquiry into whether detention has become unreasonable "will necessarily be a fact-dependent inquiry that will vary depending on individual circumstances" and "declin[ing] to establish a universal point at which detention will always be considered unreasonable"); Ly, 351 F.3d at 271 ("A bright-line time limitation . . . would not be appropriate . . . . [C]ourts must examine the facts of each case[] to determine whether there has been unreasonable delay in concluding removal proceedings.").

These three circuit courts instruct that a criminal alien may file a § 2241 petition when he contends that his removal proceedings and continued civil detention without a bond hearing have become protracted and thus violate the Due Process Clause. See Reid, 819 F.3d at 498-99; Diop, 656 F.3d at 233, 235; Ly, 351 F.3d at 272-73. Then, a federal court, examining the individual circumstances of

32

the case, will decide whether the criminal alien's continued detention has become unreasonable.  See Reid, 819 F.3d at 500-01; Diop, 656 F.3d at 234; Ly, 351 F.3d at 272-73.

Under this configuration, if the district court grants the criminal alien's § 2241 petition, it then orders the government to provide an opportunity for the alien to obtain bond.  At that point, the Third Circuit shifts the burden of proof from the petitioner to the government.  See Diop, 656 F.3d at 233.  The Third Circuit ruled that there must be a bond hearing "at which the Government bears the burden of proving that continued detention is necessary to fulfill the purposes of the detention statute."  Id.  The Sixth Circuit has not explicitly defined the mechanism by which the government must make an individualized bond determination; but, in Ly, it affirmed a district court order that directed the agency to hold a hearing.  351 F.3d at 266, 273.  The First Circuit also affirmed a district court order directing the government to hold a bond hearing.  Reid, 819 F.3d at 491-92.

The First Circuit's Reid decision contains the most extensive discussion of why an individualized case-by-case approach adheres more closely to the relevant legal precedent.  The First Circuit reasoned that, "while the Second and Ninth Circuits claim to have read an implicit 'reasonableness limitation' into § 1226(c), we think it more accurate to say that they have simply read an implicit 'six-month

expiration' into § 1226(c)." Id. at 497. The First Circuit viewed "Demore as implicitly foreclosing our ability to adopt a firm six-month rule" because "[i]n Demore, the Supreme Court declined to state any specific time limit in a case involving a detainee who had already been held for approximately six months." Id. In addition, "[t]he Demore Court also briefly discussed facts specific to the detainee, such as his request for a continuance of his removal hearing." Id. (citing Demore, 538 U.S. at 530-31 & n.15, 123 S. Ct. at 1721 & n.15).

The First Circuit concluded that, "[t]aken together, Zadvydas, Demore, and the inherent nature of the 'reasonableness' inquiry weigh heavily against adopting a six-month presumption of unreasonableness." Id. It added that the practical advantages of the bright-line approach are "persuasive justifications for legislative or administrative intervention, not judicial decree." Id. at 498.

## B.   Adoption of the Case-by-Case Approach

We join the First, Third, and Sixth Circuits and adopt the case-by-case approach. To begin with, "[r]easonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case." Diop, 656 F.3d at 234. A bright-line approach strips away the essence of a reasonableness standard.

For example, Justice Kennedy's concurrence in Demore examined the factual specifics of the case at hand. It did not attempt to impose a one-size-fits-all

34

solution. His concurrence indicated that there may be situations in which the government delays the removal proceedings and then continues to detain the alien for non-statutory purposes. See Demore, 538 U.S. at 532-33, 123 S. Ct. at 1722 (Kennedy, J., concurring). Turning to the facts of petitioner Demore's case, his concurrence concluded that a court could not draw such an inference "from the circumstances of that case." See id. at 533, 123 S. Ct. at 1726.

Further, § 1226(c) does not come ready-made with a time cutoff the way § 1231 does, suggesting that a case-by-case approach is more appropriate in this context. Specifically, the § 1231 statute in Zadvydas already had a 90-day limitation, to which the Supreme Court appended another 90 days, creating a 6-month cutoff. In contrast, the § 1226(c) statute contains no time limitation at all on which to base a firm cutoff.

In opposing a bright-line rule, the government also points out that, were we to impose a strict cutoff, a criminal alien could deliberately cause months of delays in the removal proceedings to obtain a bond hearing and then abscond and avoid removal altogether. Aliens in post-removal-period detention, on the other hand, do not have the opportunity to engage in such gamesmanship.

In addition, the complex course of events during removal proceedings is markedly different from the limited nature of what must happen in the 90-day removal period. To implement the last discrete step of removal to another country,

35

the government follows roughly the same process for each alien.  It gathers travel

documents and arranges for transportation.  The government controls that removal

process.  The detained alien cannot go back home or anywhere without the

government doing its job.  The § 1231 statute gave the government 90 days, and

the Supreme Court gave it 90 more, for a 6-month limit to accomplish this discrete

task.

But even then, as the First Circuit emphasized, the Supreme Court in

Zadvydas did not actually adopt a six-month cutoff.  As to this point, the First

Circuit explained:

> The [Supreme] Court pointed out that not every alien to be removed
> would be released after six months.  To the contrary, an alien may be
> held in confinement until it has been determined that there is no
> significant likelihood of removal in the reasonably foreseeable future.
> If six months has passed and the alien had demonstrated no significant
> likelihood of removal in the reasonably foreseeable future, then the
> government was required to respond with evidence sufficient to rebut
> that showing.  If the government could demonstrate a reasonably
> foreseeable termination point, the detention continued.

Reid, 819 F.3d at 496 (citations omitted) (quotation marks omitted).

In contrast to the 90-day removal period, removal proceedings involve many

more exigencies and the conduct of the criminal alien can equally affect the

duration of that alien's removal proceedings.  Even though criminal aliens have

aggravated felonies making them promptly removable, criminal aliens may apply

for different forms of purely discretionary relief.  Some ask for multiple

continuances, some choose to file frivolous appeals while others do not, and each IJ has a docket with different demands. There is little consistency in the pace of immigration proceedings from case to case. This difference necessitates a different approach to detention of criminal aliens during removal proceedings—one flexible enough to account for the circumstances of each case.

Critics of the case-by-case approach claim that the standard is too difficult for the federal courts to administer and creates inconsistencies in § 2241 proceedings. But federal courts have the institutional competence to make fact-specific determinations, and they have great experience applying reasonableness standards.[8] We agree with the First Circuit that the reasonableness standard adheres more closely to legal precedent, and the practical advantages of the bright-line approach are "persuasive justifications for legislative or administration intervention, not judicial decree." Id. at 498.

This brings us to the nature of the reasonableness inquiry itself.

## C.    Reasonableness Factors for the District Courts to Consider in § 2241 Cases

---

[8]The constitutional principles at play here, of course, apply to the government's conduct—detaining criminal aliens—whether a § 2241 petition is filed or only potentially forthcoming. The government is constitutionally obligated to follow the law, and the law under § 1226(c) now includes a temporal limitation against the unreasonably prolonged detention of a criminal alien without a bond hearing. The government does not need to wait for a § 2241 petition to be filed before affording an alien an opportunity to obtain bond. The government is already responsible for implementing the bond mechanism regulations for non-criminal aliens and is equipped to do the same in this context, at the point when the criminal alien's continuous mandatory detention becomes unreasonably protracted. As explained infra, the criminal alien also can appeal the District Director's initial bond determination to the IJ and BIA.

As instructed by Zadvydas and Demore, we begin with the core principle that "the reasonableness of any given detention pursuant to § 1226(c) is a function of whether it is necessary to fulfill the purpose of the statute." Diop, 656 F.3d at 234. Several factors should guide a district court in determining whether a particular criminal alien's continued detention, as required by § 1226(c), is necessary to fulfilling Congress's aims of removing criminal aliens while preventing flight and recidivism.

First, one critical factor is the amount of time that the criminal alien has been in detention without a bond hearing. Given that Congress and the Supreme Court believed that most removal proceedings would be completed within five months, and the Supreme Court provided for a six-month rule in Zadvydas, "the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues past those thresholds." See id. (emphasis added). Accordingly, there is little chance that a criminal alien's detention is unreasonable until at least the six-month mark.

Looking to the outer limit of reasonableness, we suggest that a criminal alien's detention without a bond hearing may often become unreasonable by the one-year mark, depending on the facts of the case. See Chavez-Alvarez v. Warden York Cty. Prison, 783 F.3d 469, 478 (3d Cir. 2015) ("[B]eginning sometime after the six-month timeframe considered by Demore, and certainly by the time [the

38

alien] had been detained for one year, the burdens to [the alien's] liberties outweighed any justification for . . . detain[ing] him without bond to further the goals of the statute."). The need for a bond inquiry is likely to arise in the six-month to one-year window, at which time a court must determine whether the purposes of the statute—preventing flight and criminal acts—are being fulfilled, and whether the government is incarcerating the alien for reasons other than risk of flight or dangerousness. See Demore, 538 U.S. at 532-33, 123 S. Ct. at 1722 (Kennedy, J., concurring). The government is not required to free automatically a criminal alien who obtains a bond hearing; but the government must at least afford the alien an individualized bond inquiry.

A second factor in the reasonableness evaluation is why the removal proceedings have become protracted. Courts should consider whether the government or the criminal alien have failed to participate actively in the removal proceedings or sought continuances and filing extensions that delayed the case's progress. See id. at 532, 123 S. Ct. at 1722 (Kennedy, J., concurring); Diop, 656 F.3d at 234; Ly, 351 F.3d at 272. Errors by the immigration court or the BIA that cause unnecessary delay are also relevant. See Leslie v. Att'y Gen. of the U.S., 678 F.3d 265, 269 (3d Cir. 2012); Diop, 656 F.3d at 234; Ly, 351 F.3d at 272; cf. Demore, 538 U.S. at 532, 123 S. Ct. at 1722 (Kennedy, J., concurring).

39

We are not saying that aliens should be punished for pursuing avenues of relief and appeals.  See Ly, 351 F.3d at 272 ("[A]ppeals and petitions for relief are to be expected as a natural part of the process.  An alien who would not normally be subject to indefinite detention cannot be so detained merely because he seeks to explore avenues of relief that the law makes available to him.").  However, the district court may examine the record to determine whether the alien sought repeated or unnecessary continuances, or filed frivolous claims and appeals.  See Diop, 656 F.3d at 234 ("[T]he reasonableness determination must take into account a given individual detainee's need for more or less time . . . .").  Evidence that the alien acted in bad faith or sought to deliberately slow the proceedings in hopes of obtaining release cuts against the alien.  See Chavez-Alvarez, 783 F.3d at 476; Ly, 351 F.3d at 272.

Courts conducting this reasonableness analysis have considered three more factors, including: (3) whether it will be possible to remove the criminal alien after there is a final order of removal; (4) whether the alien's civil immigration detention exceeds the time the alien spent in prison for the crime that rendered him removable; and (5) whether the facility for the civil immigration detention is meaningfully different from a penal institution for criminal detention.  See Chavez-Alvarez, 783 F.3d at 478; Ly, 351 F.3d at 271.  The government has ready access to this type of information.

40

Similarly, the First Circuit has listed these as factors a court might examine, inter alia: "the total length of the detention; the foreseeability of proceedings concluding in the near future (or the likely duration of future detention); the period of the detention compared to the criminal sentence; the promptness (or delay) of the immigration authorities or the detainee; and the likelihood that the proceedings will culminate in a final removal order." Reid, 819 F.3d at 500. We agree with the First Circuit that "[t]here may be other factors that bear on the reasonableness of categorical detention, but we need not strain to develop an exhaustive taxonomy here. We note these factors only to help resolve the case before us and to provide guideposts for other courts conducting such a reasonableness review." Id. at 501.

Our list of factors is not exhaustive. The reasonableness inquiry is necessarily fact intensive, and the factors that should be considered will vary depending on the individual circumstances present in each case. See Diop, 656 F.3d at 232-33 ("At a certain point, continued detention becomes unreasonable . . . . This will necessarily be a fact-dependent inquiry that will vary depending on individual circumstances.").

In sum, § 2241 courts must consult the record and balance the government's interest in continued detention against the criminal alien's liberty interest, always seeking to determine whether the alien's liberty interest has begun to outweigh "any justification for using presumptions to detain him without bond." See

41

Chavez-Alvarez, 783 F.3d at 478. If the balance tips in the alien's favor, the district court must grant the § 2241 habeas petition and order the government to afford the criminal alien an individualized bond inquiry.

## VII.  BOND REGULATIONS

When detained criminal aliens become entitled to a bond hearing, the agency shall conduct a bond inquiry under the procedures outlined in 8 C.F.R. § 1236.1(c)(8) and (d).  These are the existing regulations governing bond proceedings for non-criminal aliens detained under § 1226(a).  We see three primary reasons for using the existing regulations that govern non-criminal aliens.

First, as we indicate above, subsection (c) of § 1226 is an exception to subsection (a).  Generally, the Attorney General has the discretion to release aliens in removal proceedings on either bond or conditional parole.  INA § 236(a)(2), 8 U.S.C. § 1226(a)(2).  Congress, however, circumscribed the Attorney General's discretion for that subset of aliens in removal proceedings who have committed certain criminal offenses.  INA § 236(c), 8 U.S.C. § 1226(c).  It therefore makes sense that, once the government can no longer constitutionally detain a criminal alien under subsection (c) without a bond hearing, the criminal alien's detention

42

defaults to subsection (a) that governs the detention of non-criminal aliens. And subsection (a) carries with it regulations governing bond.[9]

Second, our reluctance to formulate from scratch the bond procedures to be used, and our decision to instead defer to the agency's preexisting regulations, comports with basic principles of administrative law. Courts afford agencies considerable deference in their policy realms and do not rewrite or create regulations for them to follow. See Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth., 464 U.S. 89, 98 n.8, 104 S. Ct. 439, 444 n.8 (1983) ("[A]n agency acting within its authority to make policy choices consistent with the congressional mandate should receive considerable deference from courts . . . ."); Defs. of Wildlife v. U.S. Dep't of the Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) ("The court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." (quotation marks omitted)). DHS has

---

[9]This is how detention beyond the 90-day removal period operates for criminal aliens who cannot be removed to another country. If the Attorney General chooses to release a criminal alien on terms of supervision, the alien's supervision is governed by the statute and regulations controlling non-criminal aliens' supervision. See INA § 241(a)(6), 8 U.S.C. § 1231(a)(6), cross-referencing INA § 241(a)(3), 8 U.S.C. § 1231(a)(3). We regard this as further evidence that the statutes relating to non-criminal aliens provide the general rules for detention, and the statutes governing criminal aliens represent exceptions.

43

already determined how to fairly and efficiently administer bond hearings, and we do not disturb its reasoned judgment.[10]

Third, while Sopo asks us to shift the burden of proof to the government, that would give criminal aliens a benefit that non-criminal aliens do not have. See Reid v. Donelan, 22 F. Supp. 3d 84, 92-93 (D. Mass. 2014) (explaining why the bond regulations that apply to non-criminal aliens should apply to criminal aliens once they become entitled to a bond hearing), aff'd in part and vacated in part, 819 F.3d 486 (1st Cir. 2016).[11]  We recognize that, by the time a criminal alien becomes eligible for a bond hearing, he has already experienced a lengthy detention.  That detention, however, occurs because Congress enacted the mandatory detention statute in § 1226(c), a statutory approach that comparatively disadvantages aliens who commit crimes over law-abiding aliens in removal proceedings.

Accordingly, the agency shall follow 8 C.F.R. § 1236.1(c) to afford the detainee alien with an opportunity to obtain bond from the District Director, and if

---

[10]There has been no separate constitutional challenge in this case to the bond regulations set for in 8 C.F.R. § 1236.1(c)(8) and (d) that apply to non-criminal aliens.  This decision now affords criminal aliens subject to mandatory detention the benefit of these regulations when the criminal alien's statutorily mandated detention under § 1226(c) becomes unreasonably prolonged, triggering the need for an individualized bond hearing.

[11]Although it reversed the district court's ruling as to the class claim, the First Circuit summarily affirmed the district court's ruling that Reid was entitled to a bond hearing under the regulations effectuating § 1226(a).  See Reid, 819 F.3d at 491, 501-02.  The First Circuit also noted that, after Reid received a bond hearing, the government granted him bond.  See id. at 501.

44

necessary, to appeal to the IJ and then to the BIA under the provisions outlined in § 1236.1(d). See 8 C.F.R. § 1236.1(c), (d). Like non-criminal aliens, the criminal alien carries the burden of proof and must show that he is not a flight risk or danger to others. Id. § 1236.1(c)(8).

The IJs and the BIA already have experience applying these regulations and have standards to guide them in implementing the regulations. See, e.g., In re Guerra, 24 I. & N. Dec. 37, 40 (BIA 2006) (announcing nine factors for IJs to evaluate when determining if an alien poses a danger or is likely to abscond). We are confident that criminal aliens will have an adequate opportunity to obtain release under the existing regulations that apply to non-criminal aliens.

Having settled on the reasonableness standard and the logistics of bond, we turn back to Sopo and his § 2241 petition.

## VIII.  SOPO'S DETENTION

Application of the above reasonableness factors to Sopo's case is straightforward. As to the first factor, Sopo has been in continuous detention for four years without a bond hearing, at least three-and-a-half of which have been under § 1226(c) detention.[12] The sheer length of Sopo's detention on its own is

---

[12]The government asserts that Sopo's detention shifted from § 1226(c) to § 1231 when the BIA issued an administratively final removal order on August 10, 2015, citing mainly a footnote in Akinwale v. Ashcroft, 287 F.3d 1050, 1052 n.4 (11th Cir. 2002). Sopo responds that he has remained in § 1226(c) detention the whole time he has been in custody. He argues that the "removal period," and § 1231 detention, never began because this Court issued a stay of

45

enough to convince us that his liberty interest long ago outweighed any justifications for using presumptions to detain him without a bond inquiry. See Chavez-Alvarez, 783 F.3d at 478.

As to the second factor—cause of delay—the government did not respond to Sopo's FOIA request for months. The prosecutor refused to file a copy of Sopo's 2004 asylum application. The bulk of the government's delay, though, came from the IJ erring several times. Indeed, Sopo's proceedings continue to this day.

While Sopo refused to file a new asylum application form in 2012, insisted on retrieval of his 2004 form, and requested continuances, the delays he caused were negligible compared to the amount of time it took for his case move back and forth between the IJ and the BIA three times. Importantly too, Sopo's civil immigration detention is in a prison-like facility and is now longer than his prison time for bank fraud.

"[T]here can be no question that [Sopo's] detention . . . without further inquiry into whether it was necessary to ensure his appearance at the removal proceedings or to prevent a risk of danger to the community, [is] unreasonable and,

---

removal while it was considering his petition for review. See INA § 241(a)(1)(B)(ii), 8 U.S.C. § 1231(a)(1)(B)(ii).

We need not decide whether part of Sopo's four-year detention shifted from § 1226(c) to § 1231 at some point, or the effect of the stay, because his case is now back before the BIA, which means his detention continues under § 1226(c). The parties agree on this point. Furthermore, even disregarding the six-month period in dispute, from August 10, 2015 to this Court's remand of Sopo's petition for review on February 2, 2016, Sopo's § 1226(c) detention has lasted three-and-a-half years.

therefore, a violation of the Due Process Clause." Diop, 656 F.3d at 234-35.

Accordingly, we order the government to grant Sopo an individualized bond

inquiry within ten days of the filing date of this opinion.

## IX.  CONCLUSION

In conclusion, we vacate the district court's order denying Sopo's § 2241

petition and remand for an entry of judgment in Sopo's favor, consistent with this

opinion.

**VACATED AND REMANDED WITH INSTRUCTIONS.**

JILL PRYOR, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's decision to vacate the district court's order denying Maxi Dinga Sopo's 28 U.S.C. § 2241 petition and to remand for entry of judgment in Mr. Sopo's favor, ordering that Mr. Sopo promptly receive an individualized bond hearing. I join fully in Section V of the majority opinion, which holds that, as a matter of constitutional avoidance, 8 U.S.C. § 1226(c) must be read to contain an implicit temporal limitation against unreasonably prolonged detention of a criminal alien without a bond hearing. But I must dissent in part because I disagree with the majority opinion's approach in Sections VI and VII. Specifically, I would not analyze the reasonability of the duration of an alien's detention under § 1226(c) using a flexible "case-by-case" approach nor would I place the burden of proof on the alien at the ensuing bond hearing. Instead, I agree with the Second and Ninth Circuits that, after six months' detention, a criminal alien detained pursuant to § 1226(c) is entitled to a bond hearing at which the government bears the burden of demonstrating the necessity of continued detention by clear and convincing evidence.

## I.    A Criminal Alien's Detention under § 1226(c) Becomes Unreasonably Prolonged after Six Months.

### A.    Background on the Constitutionality of Criminal Alien Detention

The Supreme Court has yet to address directly the constitutionality of unreasonably prolonged detention under § 1226(c), which requires that aliens

convicted of certain crimes be held during the pendency of their removal proceedings.  The Court has, however, decided two cases that broadly concern the constitutional limits surrounding immigration detention.  In *Zadvydas v. Davis*, the Supreme Court considered a challenge to prolonged detention under a different statute, 8 U.S.C. § 1231(a).  533 U.S. 678, 683 (2001).  Once an alien has received a final order of removal, the government typically deports the alien within a 90-day "removal period."  *Id.* at 682.  During this period, § 1231(a) requires the government to keep the alien in custody.  *Id.* at 683; 8 U.S.C. § 1231(a)(2).  If, after the expiration of the removal period, the alien has not yet been deported, § 1231(a) authorizes the government to continue detaining the alien if certain conditions are met.[1]  *Zadvydas*, 533 U.S. at 683; 8 U.S.C. § 1231(a)(6).

Applying the doctrine of constitutional avoidance, the Supreme Court read § 1231(a) as containing an implicit temporal limitation on the government's authority to continue detaining aliens after the 90-day period.  *Zadvydas*, 533 U.S. at 682.  The Court reasoned that the indefinite detention of such aliens could not be justified by the statute's professed goals of preventing aliens from absconding and of protecting the community.  *Id.* at 690-91.  As a result, the Court adopted a six-

---

[1] An alien may be detained beyond the 90-day removal period if he (1) is inadmissible; (2) is removable as a result of violations of status requirements, violations of entry conditions, violations of criminal law, or reasons of security or foreign policy; or (3) has been determined to be a public risk or unlikely to comply with the order of removal. *Zadvydas*, 533 U.S. at 682; 8 U.S.C. § 1231(a)(6).

month presumption of reasonability, holding that "[a]fter [a] 6-month period [of detention], once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing." *Id.* at 701. Absent such a showing, the alien must be released. *Id.*

After *Zadvydas*, in *Demore v. Kim* the Supreme Court considered a facial challenge to the constitutionality of the statute at issue here, § 1226(c). 538 U.S. 510, 514 (2003). The Court ruled that Congress could, consistent with due process, require the detention of a criminal alien during her removal proceedings without first providing a bond hearing. *Id.* at 513. Critically, however, the Court held that the government could only "constitutionally detain deportable aliens during the *limited period* necessary for their removal proceedings." *Id.* at 526 (emphasis added). It did not address whether Congress could authorize prolonged detention of aliens beyond the period reasonably necessary to complete their removal proceedings.

Justice Kennedy provided the fifth vote for the majority in *Demore*. His concurring opinion clarified his position that, although the Due Process Clause allows detention without a bond hearing under § 1226(c), it does not permit unreasonably prolonged detention. *Id.* at 532-33 (Kennedy, J., concurring). He noted that "[w]ere there to be an unreasonable delay . . . in pursuing and

completing deportation proceedings, it could become necessary then to inquire whether the detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Id.*

Outside of Justice Kennedy's concurrence in *Demore*, the Supreme Court has never addressed whether under § 1226(c) the government can detain criminal aliens for an unreasonably prolonged period of time. But, as the majority opinion here describes, five other circuits have addressed that precise issue. And every one of these circuits has agreed with us that § 1226(c) must be read to contain an implicit limitation against the unreasonably prolonged detention of criminal aliens without a bond hearing, because without such a limitation, detention under § 1226(c) would raise grave constitutional concerns.[2]

Despite agreeing that § 1226(c) does not permit the government to detain a criminal alien for an unreasonable amount of time without providing a bond hearing, the circuits disagree on how best to determine what constitutes a reasonable (and therefore constitutionally permissible) duration of detention. Those circuits to have addressed the issue have applied one of two methods. The Second and Ninth Circuits use a "bright-line" approach that presumes an alien's detention to be unreasonable in duration once it passes the six-month mark. *See*

---

[2] *See Reid v. Donelan*, 819 F.3d 486, 494-95 (1st Cir. 2016); *Lora v. Shanahan*, 804 F.3d 601, 616 (2d Cir. 2015), *petition for cert. filed*, 84 U.S.L.W. 3562 (U.S. Apr. 21, 2016) (No. 15-1307); *Rodriguez v. Robbins*, 715 F.3d 1127, 1134 (9th Cir. 2013); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 231 (3d Cir. 2011); *Ly v. Hansen*, 351 F.3d 263, 270 (6th Cir. 2003).

*Lora v. Shanahan*, 804 F.3d 601, 616 (2d Cir. 2015), *petition for cert. filed*, 84 U.S.L.W. 3562 (U.S. Apr. 21, 2016) (No. 15-1307); *Rodriguez v. Robbins*, 715 F.3d 1127, 1139 (9th Cir. 2013).  In contrast, the First, Third, and Sixth Circuits have adopted a "case-by-case" or "flexible" approach that requires courts, on habeas review, to apply a multi-factor balancing test to determine whether an alien's detention has become unreasonably prolonged.  *See Reid v. Donelan*, 819 F.3d 486, 500 (1st Cir. 2016); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 232-33 (3d Cir. 2011); *Ly v. Hansen*, 351 F.3d 263, 271 (6th Cir. 2003).

Under either approach, once the duration of an alien's detention is determined to be unreasonable, the government must provide an opportunity for the alien to obtain release on bond, usually via an individualized bond hearing before an immigration judge.  *See, e.g.*, *Lora*, 804 F.3d at 616; *Diop*, 656 F.3d at 233.  Significantly, the mere fact that the government has detained an alien for an unreasonable amount of time does not mean that the alien is entitled to release.  *See, e.g.*, *Rodriguez v. Robbins*, 804 F.3d 1060, 1077 (9th Cir. 2015), *petition for cert. filed sub nom.*, *Jennings v. Rodriguez*, 84 U.S.L.W. 3562 (U.S. Mar. 25, 2016) (No. 15-1204).  At that point, the government may continue to detain the alien if, after a hearing, it is determined that "detention is still necessary to fulfill [§ 1226(c)'s] purposes of ensuring that [the] alien attends removal proceedings and that his release will not pose a danger to the community."  *Diop*, 656 F.3d at 231.

The variance among circuits about how best to circumscribe constitutionally-problematic detention under § 1226(c) runs deeper than a mere disagreement regarding the proper method of analysis.  Circuits disagree not only on the method for determining whether detention has become unreasonable in length, but also on the reasons for adopting one method over another.  Most notably, the Third and Sixth Circuits adopted the case-by-case approach because it provides "leeway for expansion or contraction as the necessities of the case and the immigration judge's caseload warrant."  *Ly*, 351 F.3d at 271; *see also Diop*, 656 F.3d at 234 ("Reasonableness, by its very nature, is a fact-dependent inquiry requiring an assessment of all of the circumstances of any given case.").  In contrast, while acknowledging that the case-by-case approach suffers from a number of deficiencies, the First Circuit nonetheless adopted the case-by-case approach because it believed that approach "adhere[d] more closely to legal precedent."  *Reid*, 819 F.3d at 498.

In the face of this disagreement among the circuits, the majority opinion adopts the case-by-case approach, as well as the various rationales of the First, Third, and Sixth Circuits for doing so.  Thus, the majority opinion holds that a criminal alien may file a § 2241 petition when he contends that his removal proceedings and continued civil detention without a bond hearing have become protracted and thus violate the Due Process Clause.  If a district court grants the

53

petition, the government must provide an opportunity for the alien to obtain bond at an individualized bond hearing. In deciding whether to grant relief, the majority opinion instructs district courts to weigh those factors the First, Third, and Sixth Circuits have previously identified. These factors include, but are not limited to: the reasons why removal proceedings have become protracted; whether it will be possible to remove the alien to another country at the end of the removal proceedings; the likelihood that the proceedings will culminate in a final removal order; whether the detention has exceeded the time the alien spent in prison for the crime that rendered her removable; the type of facility in which the alien is being detained; the likely duration of future detention; and the length of the detention to date. In considering the length of an alien's detention, the majority opinion states that "[t]he need for a bond inquiry is likely to arise in the six-month to one-year window." Maj. Op. at 38-39.

After considering the majority opinion as well as the approaches and reasoning of other circuits, I disagree with the majority's adoption of the case-by-case approach and would instead follow the Second and Ninth Circuits in adopting the bright-line approach, which I conclude is the best method for analyzing prolonged detention of criminal aliens. To explain why, I will begin by discussing why I believe the bright-line approach is superior to the case-by-case approach. I will then address separately the First Circuit's concern that legal precedent

54

compels the adoption of the case-by-case approach, even in the face of that approach's infirmities.

## B. The Bright-Line Approach is Superior to the Case-by-Case Approach.

The case-by-case approach tasks courts with considering a variety of factors in deciding whether a criminal alien has been detained for an unreasonable length of time and thus is entitled to a bond hearing. In theory, the ability to take multiple factors into account when deciding whether an alien's detention has become unreasonably prolonged allows courts applying this approach to consider the unique exigencies and circumstances of each alien's case. In practice, however, this methodology—while versatile—is unlikely to result in predictable or consistent outcomes.

The Supreme Court recognized as much in the context of § 1231(a) detention. In *Zadvydas* the Court adopted a six-month presumption of reasonableness for detention under § 1231(a), acknowledging that it had "adopted similar presumptions in other contexts to guide lower court determinations," that bright-line approaches benefit "uniform administration in the federal courts," and that such an approach would limit the occasions when courts would have to make "difficult judgments" regarding whether to release § 1231(a) detainees. 533 U.S.

55

at 700-01.[3]  Relatedly, the Second Circuit has observed that "apply[ing] a

reasonableness test on a case-by-case basis" frequently causes "pervasive

inconsistency and confusion" among district courts.  *Lora*, 804 F.3d at 615.  The

First Circuit—notwithstanding its decision to adopt the case-by-case approach—

agreed with the Second Circuit's assessment, noting that the case-by-case approach

"has resulted in wildly inconsistent determinations."  *Reid*, 819 F.3d at 497.

Unsurprisingly, the Third Circuit's experience in trying to implement its own case-

---

[3] The majority opinion attempts to distinguish the application of a six-month presumption in *Zadvydas* from a similar application here by arguing that "*Zadvydas* did not actually adopt a six-month cutoff."  Maj. Op. at 36.  It is true that under the Supreme Court's decision in *Zadvydas*, "not every alien to be removed [is] released after six months," *id.* (quoting *Reid*, 819 F.3d at 496), but neither would every criminal alien under the bright-line approach.  I see very little to distinguish the Supreme Court's approach in *Zadvydas* from the bright-line approach I endorse here.  Both approaches permit the government to detain an alien for a period of six months and both also permit an alien's continued detention after the expiration of that period if the government can make the requisite showing justifying continued detention.  If there is a material difference between the two approaches, the majority opinion never identifies it.

The majority opinion also attempts to explain away the Supreme Court's apparent preference for a bright-line approach to prolonged alien detention by suggesting that such an approach is less appropriate for application to § 1226(c) detention because "§ 1226(c) does not come ready-made with a time cutoff the way § 1231 does."  *Id*. at 35.  The majority opinion is correct that § 1231(a) permits the government to detain an alien subject to a final order of removal for a period of 90 days.  8 U.S.C. § 1231(a)(2).  But *Zadvydas* concerned detention after the expiration of that 90-day removal period, *Zadvydas*, 533 U.S. at 682, and detention after the removal period is not subject to any statutory time "cutoff."  *See* 8 U.S.C. § 1231(a)(6).  Beyond noting the initial 90-day removal period, the majority opinion never satisfactorily explains why the Supreme Court's adoption of a six-month presumption in *Zadvydas* would make a similar bright-line approach unreasonable in the context of § 1226(c).  Indeed, the majority opinion cites to nothing in *Zadvydas* indicating that § 1231(a)'s specification of a 90-day removal period influenced in any way the Court's decision to recognize a presumption of unreasonableness after six months in lieu of implementing a more flexible approach.  Moreover, the majority opinion's apparent reliance on *Zadvydas* to demonstrate that a bright-line approach is inappropriate seems difficult to reconcile with the majority's suggestion that "[t]he need for a bond inquiry is likely to arise in the six-month to one-year window."  Maj. Op. at 38-39.

by-case approach for § 1226(c) detainees has borne out these observations. *See* Farrin R. Anello, *Due Process and Temporal Limits on Mandatory Immigration Detention*, 65 Hastings L.J. 363, 396 (2014) ("District court judges in the Third Circuit have applied the reasonableness standard to interpret similar facts in different ways . . . .").

Importantly, the risk that the case-by-case approach will result in unpredictable, inconsistent, or arbitrary outcomes itself raises serious due process concerns. "In its commonest form, substantive due process doctrine reflects the simple but far-reaching principle . . . that government cannot be arbitrary." Richard H. Fallon, Jr., *Some Confusions About Due Process, Judicial Review, and Constitutional Remedies*, 93 Colum. L. Rev. 309, 310 (1993); *accord Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) ("The touchstone of due process is protection of the individual against arbitrary action of government."). Indeed, to the extent that the case-by-case approach results in unpredictable or inconsistent outcomes, it could be regarded as "incompatible with the Rule of Law." Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989).

We should take these concerns particularly seriously because the arbitrary outcomes in these proceedings threaten to deprive § 1226(c) detainees of their fundamental right to freedom from bodily restraint, which "has always been at the core of the liberty protected by the Due Process Clause from arbitrary

57

governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). Lest we forget, aliens detained under § 1226(c)

> are treated much like criminals serving time: They are typically housed in shared jail cells with no privacy and limited access to larger spaces or the outdoors. Confinement makes it more difficult to retain or meet with legal counsel, and the resources in detention facility law libraries are minimal at best, thereby compounding the challenges of navigating the complexities of immigration law and proceedings. In addition, visitation is restricted and is often no-contact, dramatically disrupting family relationships. While in detention, [detainees] have missed their children's births and their parents' funerals. After losing a vital source of income, [detainees'] spouses have sought government assistance, and their children have dropped out of college.

*Rodriguez*, 804 F.3d at 1073. Furthermore, the length of an alien's detention often "bear[s] no relationship to the seriousness of [her] criminal history" or the merit of her defenses to removal. *Id.* at 1079.

Although the majority opinion acknowledges these due process concerns, it says very little to assuage them, pushing them aside with the general assertion that "federal courts have the institutional competence to make fact-specific determinations, and they have great experience applying reasonableness standards." Maj. Op. at 37. I do not doubt of course the competence of courts to make fact-specific determinations or apply reasonableness standards in general. But I must acknowledge the mounting evidence demonstrating that, in the specific context of § 1226(c) detention and despite the best efforts of judges, courts have been unable to apply flexible reasonableness standards in a manner that generates

58

predictable, consistent, and fair outcomes. Indeed, even while adopting the case-by-case approach, the First Circuit observed, "courts that have adopted the [case-by-case] approach have questioned the federal courts' institutional competence to adjudicate these issues." *Reid*, 819 F.3d at 498 (internal quotation marks omitted).

The bright-line approach does not raise these due process concerns. Instead, it offers predictability in application and consistency in result that the case-by-case approach could never hope to achieve. After six months, an alien detained under § 1226(c) would be entitled to receive a bond hearing on the necessity of his continued detention. If the government failed to provide such a hearing, the alien would be entitled to habeas relief. The clarity of this mandate would benefit not only detained aliens, who would know to seek redress if the government failed to provide them a hearing after six months' detention, but also courts, which would not have to engage in a weighing of multiple factors merely to decide whether and when a hearing must be provided. This clarity and predictability is particularly critical in the immigration context, where detainees frequently lack knowledge of the American court system; the resources, financial and otherwise, to obtain an attorney; and "the language skills required to navigate the legal thicket." *Reid v. Donelan*, 991 F. Supp. 2d 275, 281 (D. Mass. 2014), *aff'd in part and vacated in part*, 819 F.3d 486 (1st Cir. 2016).

Significantly, the case-by-case approach provides no appreciable benefit to offset the inconsistency, unpredictability, and confusion it begets. The primary advantage of a case-by-case approach is—unsurprisingly—flexibility. But the bright-line approach provides comparable flexibility; it simply comes into play at a different stage of the process.[4] Under the bright-line approach, criminal aliens are not automatically released after six months. They are merely afforded bond hearings, at which an immigration judge, applying a multi-factor balancing approach, can make individualized determinations concerning whether continued detention is justified. *See Guerra*, 24 I. & N. Dec. 37, 39-40 (BIA 2006).

In fact, all of the factors the majority opinion instructs courts to consider when applying the case-by-case approach, as well as any other relevant facts and circumstances, could just as well be considered by an immigration judge deciding whether to release a § 1226(c) detainee on bond. *See id.* at 39 (recognizing that at a bond hearing there is no "limit [to] the discretionary factors that may be considered . . . in determining whether to detain an alien pending a decision on . . . removal"). In effect, the majority opinion's case-by-case approach will likely result in the consideration of similar factors in two separate individualized

---

[4] It is unclear to me that the majority opinion's case-by-case approach even affords courts substantially more flexibility than does the bright-line approach. Under the case-by-case approach, as the duration of detention grows, a detainee will either get released or become entitled to a bond hearing at some point. The majority opinion concedes that this point is in all likelihood sometime between six months and one year. Maj. Op. at 38-39. Thus, the flexibility for which the majority opinion advocates diminishes over time and in most cases will disappear after 12 months.

inquiries: once when determining whether an alien is entitled to a bond hearing in the first place and once again when deciding, after such a hearing, whether to release the alien on bond.   Indeed, in *Reid*, the First Circuit acknowledged some overlap.  *See Reid*, 819 F.3d at 498 ("[I]t is . . . likely that the evidence and arguments presented in a 'reasonableness' hearing before a federal court are likely to overlap at the margins with the evidence and arguments presented at a bond hearing before an immigration court.  This inefficient use of time, effort, and resources could be especially burdensome in jurisdictions with large immigration dockets.").  I see no compelling reason why, when deciding whether to afford a bond hearing, it is necessary for federal courts to consider factors that could simply be considered at the bond hearing itself.

What's more, the majority opinion never adequately explains why flexibility is necessary in deciding the threshold question of whether an alien should receive a bond hearing.  The majority advocates a flexible approach because removal proceedings are "complex" and "involve many . . . exigencies."  Maj. Op. at 35-36.  While I do not quibble with the majority opinion's characterization of the removal process, it seems to me that where flexibility is truly required is in determining whether to release an alien on bond.  The complexity of removal proceedings does not explain the necessity of flexibility in deciding the antecedent question of when

61

a detainee becomes entitled to a bond hearing, particularly because the primary consequence of that decision would be the provision of such a hearing.[5]

The majority argues that a flexible approach to deciding when a bond hearing must be held is preferable because "were we to impose a strict cutoff, a criminal alien could deliberately cause months of delays in the removal proceedings to obtain a bond hearing and then abscond and avoid removal altogether." *Id.* at 35. But this concern conflates the question of whether an alien is entitled *to a bond hearing* with the question of whether that alien is entitled *to release*. Again, under the bright-line approach, an alien who deliberately delayed her removal proceedings would, after six months, be entitled to a bond hearing. But she would not be entitled to release on bond. At the hearing, an immigration judge would consider whether she was dangerous or likely to abscond to avoid removal and then deny her release if she was either. *See Lora*, 804 F.3d at 616 (holding that an alien must be released unless the government demonstrates, at a bond hearing, that the alien "poses a risk of flight or a risk of danger to the community"). Further, an alien who engaged in intentional delay would be an

---

[5] It should go without saying that while the bright-line approach could conceivably result in an increase in the number of bond hearings and thus in attendant administrative expense, any such cost pales in comparison to the deprivation of liberty suffered by § 1226(c) detainees who have languished in detention for an unreasonably long time. Moreover, to the extent the case-by-case approach reduces administrative expense by decreasing the number of bond hearings provided to criminal aliens, any cost savings will likely be offset by an increase in the judicial costs associated with applying the case-by-case approach on habeas review. *See Reid*, 819 F.3d at 498.

62

unlikely candidate for release given that at the bond hearing the immigration judge would have "broad discretion" to continue detaining the alien because of her use of delay tactics. *Guerra*, 24 I. & N. Dec. at 39.

Plainly stated, the bright-line approach provides a clear rule of application regarding when § 1226(c) detainees should receive bond hearings, while at the same time providing the flexibility to consider individual circumstances when deciding whether to release those detainees on bond. In contrast, recent history demonstrates that the case-by-case approach risks causing pervasive arbitrariness and inconsistency. We should not require criminal aliens suffering imprisonment to gamble their liberty in an unpredictable process that potentially "leave[s] room for the play and action of purely . . . arbitrary power," particularly when that process yields such a meager benefit. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Given these considerations, I would follow the Second and Ninth Circuits in adopting the bright-line approach.

## C.    Legal Precedent Does Not Compel the Adoption of the Case-by-Case Approach.

The majority opinion adopts the case-by-case approach not only for the reasons discussed above, but also because the majority "agree[s] with the First Circuit that the [case-by-case approach] adheres more closely to legal precedent." Maj. Op. at 37. Like the Third and Sixth Circuits, the First Circuit applied the case-by-case approach to analyze the reasonableness of a criminal alien's prolonged

63

detention under § 1226(c).  Its rationale for doing so, however, differed markedly from that of the Third and Sixth Circuits.  In *Reid*, the First Circuit acknowledged the shortcomings of the case-by-case approach, noting that "[f]rom a . . . practical standpoint, . . . the [case-by-case] approach employed by the Third and Sixth Circuits has little to recommend it."  819 F.3d at 497.  Nonetheless, the court proceeded to adopt that approach because it "adhere[d] more closely to legal precedent," concluding that the "practical advantages" of the bright-line approach served only as "persuasive justifications for legislative or administrative intervention, not judicial decree."  *Id.* at 498 (footnote omitted).

The First Circuit's analysis turned on a subtle parsing of the statutory purposes undergirding § 1226(c).  Like other forms of immigration detention, detention pursuant to § 1226(c) is driven by the broad statutory goals of protecting the public and ensuring that aliens appear for their removal proceedings.  *Demore*, 538 U.S. at 531 (Kennedy, J. concurring).  But § 1226(c) distinguishes itself from other statutory provisions authorizing immigration detention in that it mandates detention for certain aliens.  The First Circuit reasoned that this "mandatory treatment of a certain class of criminal aliens" is the "animating force behind § 1226(c)."  *Reid*, 819 F.3d at 497.  Thus, the court concluded, any inquiry into the reasonableness of detention under § 1226(c) necessitates separately considering this unique statutory purpose.  *Id.*

64

As I read it, the First Circuit's opinion posited that a § 1226(c) detainee challenging the reasonableness of her continued detention must do so in two separate ways. First, she must demonstrate that it is unreasonable to detain her as a categorical matter, that is, her detention cannot be justified merely by the fact that she belongs in the class of aliens covered by § 1226(c). Second, once the categorical purpose surrounding her detention evaporates, she must demonstrate, at a bond hearing, that her detention cannot be justified on an individualized basis.[6]

*Id.*

According to the First Circuit, assessing whether the government may continue detaining an alien as a categorical matter requires conducting an individualized inquiry into the "reasonable presumptions and generic rules" upon which Congress relied in deciding that mandatory detention was necessary. *Id.* at 499 (internal quotation mark omitted). Courts evaluating the categorical nature of an alien's detention under § 1226(c) thus should consider whether those presumptions—that the government likely will succeed in removing a criminal alien and will do so in a relatively brief period of time—continue to hold true for

---

[6] Although the First Circuit has reconceptualized application of the case-by-case approach to deciding whether detention under § 1226(c) is reasonable, its two-step approach still follows the same broad analysis as that of other circuits. At the first step, a court on habeas review decides whether a § 1226(c) detainee is entitled to a bond hearing or whether the government may continue her detention as a categorical matter. At the second step, an immigration judge at a bond hearing decides whether to release the alien after conducting an individualized inquiry into her likelihood of absconding or presenting a danger to the public. *See Reid*, 819 F.3d at 499-500.

the petitioning alien. *Id.* Because courts applying the bright-line approach never question these presumptions, said the First Circuit, those courts fail to conduct a proper inquiry into whether the categorical nature of the alien's detention is reasonable. *See id.* at 497 (characterizing the bright-line approach as a "six-month expiration" rather than an "implicit reasonableness limitation" (internal quotation marks omitted)). Only the case-by-case approach affords courts the opportunity to analyze the presumptions underlying § 1226(c)'s categorical detention; thus, the First Circuit reasoned, only that approach conducts a proper reasonableness inquiry.

But even accepting the First Circuit's characterization of the reasonableness inquiry, I fail to see how existing precedent inexorably compels courts to adopt the case-by-case approach. The flaw in the First Circuit's reasoning is its assumption that the presumptions supporting Congress's categorical treatment of § 1226(c) detainees can be challenged only on an individualized basis. A presumption certainly may be unreasonable as applied to an individual, but at a certain point, the presumption also becomes unreasonable on a broader scale. According to statistics cited by the Supreme Court, "in 85% of the cases in which aliens are detained pursuant to § 1226(c), removal proceedings are completed in an average time of 47 days and a median of 30 days. In the remaining 15% of cases . . . [proceedings are completed in] an average of four months, with a median time that

is slightly shorter." *Demore*, 538 U.S. at 529 (citation omitted).  Given that the vast majority of removal proceedings are completed within four months, it hardly seems a stretch to conclude that Congress's presumptions regarding the duration of, and the government's likelihood of success at, removal proceedings are unreasonable as applied to the small subset of aliens who remain in detention for longer than six months.  The First Circuit's opinion failed to explain why taking a broader view of the reasonableness of Congress's presumptions is improper.  And, notably, the opinion cited no precedent indicating that in interpreting § 1226(c) courts are required to examine those presumptions on a detainee-by-detainee basis.

To the contrary, the categorical nature of § 1226(c)'s treatment of criminal aliens would seem to warrant a similarly categorical approach to the reasonableness of prolonged detention.  A bright-line rule like that adopted by the Second and Ninth Circuits is more consistent with the "specific purpose of § 1226(c) . . . to *categorically* deny bond hearings to a class of aliens." *Reid*, 819 F.3d at 499.  Indeed, such a rule would categorically deny bond hearings for every § 1226(c) detainee for a period of six months.  The case-by-case approach, in contrast, cannot "categorically deny bond hearings" because it provides no limits on when an alien can request a hearing or when a court may provide one.  Under the case-by-case approach, an alien could, in theory, request and receive a bond hearing within days after his detention commenced, while others request and

67

receive hearings one month, six months, even one year down the line.  Although a

§ 1226(c) detainee may be extremely unlikely to receive a hearing so early in his

detention, nothing about the case-by-case approach unconditionally precludes that

possibility.  This seems inconsistent with § 1226(c)'s "categorical and mandatory

treatment of a certain class of criminal aliens," which the First Circuit described as

the "animating force" behind that statutory provision.  *Id.* at 497.

Nor is the bright-line approach inconsistent with *Demore*, as the First Circuit

implied.  *Id*.  While it is true that "[i]n *Demore*, the Supreme Court declined to

state any specific time limit," *id.*, I do not infer from that omission that a bright-

line rule would be inappropriate.  The petitioner in *Demore* mounted a facial

challenge to § 1226(c):  as the First Circuit observed, "the petitioner [in *Demore*]

argued that his detention was unconstitutional *from the outset* due to the

categorical nature of [§ 1226(c)'s] mandatory detention regime."  *Id.* at 493.  The

Supreme Court therefore had no reason to address whether the petitioner's

detention had been unreasonably prolonged or the best method for making that

determination.  *See Lowden v. Nw. Nat'l Bank & Tr. Co.*, 298 U.S. 160, 162 (1936)

(observing that the Supreme Court "will not answer abstract questions unrelated to

the pending controversy").

The First Circuit also observed that "[t]he *Demore* Court . . . briefly

discussed facts specific to the detainee, such as his request for a continuance of his

removal hearing" and inferred from this brief discussion that, given the opportunity, the Court would have adopted the case-by-case approach. *Reid*, 819 F.3d at 497. But the Supreme Court was not discussing those facts in the context of deciding whether the detainee's individual circumstances warranted a bond hearing. *See Demore*, 538 U.S. at 529-30. As I have already explained, the Supreme Court had no reason to pass on that issue because *Demore* concerned a facial challenge to the constitutionality of § 1226(c). Instead, the Court was using those facts to distinguish the result in *Zadvydas* by emphasizing that the indefinite detention at issue there was more constitutionally problematic than the comparatively brief detention authorized by § 1226(c). *See id.*

Justice Kennedy's concurrence in *Demore* is also consistent with the bright-line approach. His concurring opinion noted that "[w]ere there to be an unreasonable delay . . . in pursuing and completing deportation proceedings," a criminal alien might be entitled to a bond hearing. *Id.* at 532 (Kennedy, J. concurring). Nothing in the opinion suggested that the inquiry regarding whether there has been an unreasonable delay must be conducted on an individualized basis.[7]

---

[7] The majority opinion reads much into Justice Kennedy's statement that "the circumstances of [the petitioner's] case" in *Demore* did not warrant an inference that the government had detained the petitioner for non-statutory purposes, *Demore*, 538 U.S. at 533 (Kennedy, J. concurring), concluding that Justice Kennedy had "examined the factual specifics of the case at hand." Maj. Op. at 34. But Justice Kennedy's opinion never discussed any of the

I also disagree with the First Circuit's contention that we should ignore the "practical advantages" of the bright-line approach. *Reid*, 819 F.3d at 498. We are fashioning a legal test for determining when a § 1226(c) detainee becomes entitled to a bond hearing. Whether a test is easily administrable and whether it will generate predictable, consistent results are factors we properly consider—indeed should consider—in choosing the appropriate test. *See generally* Scalia, *supra*, at 1179, 1187. And, in fact, the Supreme Court regularly does just that. *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 175 (2008) ("In determining what is reasonable under the Fourth Amendment, we have given great weight to the essential interest in readily administrable rules." (internal quotation marks omitted)); *Ariz. Dep't of Revenue v. Blaze Constr. Co.*, 526 U.S. 32, 37 (1999) ("The need to avoid litigation and to ensure efficient tax administration counsels in favor of a bright-line standard for taxation of federal contracts . . . ."); *see also Wos v. E.M.A. ex rel. Johnson*, 133 S. Ct. 1391, 1408 (2013) (Roberts, J. dissenting) ("The reasons for

---

factors the majority opinion identifies as pertinent to determining whether a criminal alien's detention is unreasonably prolonged. Indeed, in observing that "a lawful permanent resident alien . . . could be entitled to an individualized determination as to his risk of flight and dangerousness if the continued detention became unreasonable," Justice Kennedy only mentioned "unreasonable delay" in concluding removal proceedings as a factor favoring the provision of a bond hearing. *Demore*, 538 U.S. at 532 (Kennedy, J. concurring). If anything, this singular focus on the duration of a criminal alien's detention when deciding whether to grant a bond hearing seems, to me, more consistent with the bright-line approach than a multi-factor, case-by-case approach.

drawing a bright line . . . are obvious and familiar.  Bright lines provide clear

notice . . . . [and] are easy, cheap, and administrable . . . ." (citation omitted)).

At bottom, and for the reasons I have already discussed, I do not believe we

are compelled by legal authority to adopt the case-by-case approach.  And I see no

reason to ignore the "practical" concerns that plague it.  Because, as the First

Circuit recognized, if not mandated by legal precedent the case-by-case approach

has "little to recommend it," *Reid*, 819 F.3d at 497, I would adopt the Second and

Ninth Circuits' bright-line approach.

## II.    After Six Months the Government Should Have to Demonstrate the Necessity of Continued Detention by Clear and Convincing Evidence.

Even where, as in this context, some period of prolonged detention is

constitutionally permissible, "due process requires 'adequate procedural

protections' to ensure that the government's asserted justification for physical

confinement 'outweighs the individual's constitutionally protected interest in

avoiding physical restraint.'"  *Casas-Castrillon v. Dep't of Homeland Sec.*,

535 F.3d 942, 950 (9th Cir. 2008) (quoting *Zadvydas*, 533 U.S. at 690)).  The

majority opinion applies the bond procedures governing non-criminal aliens

detained under 8 U.S.C. § 1226(a)[8] to criminal aliens detained under § 1226(c),

---

[8] Section 1226(a) governs the detention of non-criminal aliens during the pendency of their removal proceedings.  It grants the Attorney General discretion to detain a non-criminal alien throughout the alien's removal proceedings or to release the alien on bond or conditional parole.  8 U.S.C. § 1226(a).  The Department of Homeland Security has promulgated regulations

71

presumably satisfied that these procedures—which place the burden of proof on the alien at bond proceedings—fulfill the dictates of due process.  *See* 8 C.F.R. § 1236.1.  I disagree.

Noticeably absent from the majority opinion's discussion of the appropriate burden of proof is any mention of what it previously described as "the profound liberty interest at stake," Maj. Op. at 26—a striking omission considering the Supreme Court's instruction that "due process places a heightened burden of proof on the State in civil proceedings in which the individual interests at stake are both particularly important and more substantial than mere loss of money."  *Cooper v. Oklahoma*, 517 U.S. 348, 363 (1996) (alterations and internal quotation marks omitted).  It would be hard to overstate the importance of the interest at stake here. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."  *Zadvydas*, 533 U.S. at 690.

Because of the harsh practical realities of confinement, the Supreme Court has historically afforded very strong procedural protections to individuals facing

---

setting forth the process by which a § 1226(a) detainee may obtain release.  *See* 8 C.F.R. § 1236.1.  These regulations permit an agency officer to release an alien detained under § 1226(a) if the alien can "demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding."  *Id.* § 1236.1(c)(8).  The regulations also detail the procedures for appealing the officer's decision to an immigration judge or the Board of Immigration Appeals.  *See id.* § 1236.1(d).

prolonged civil detention. *See Kansas v. Hendricks*, 521 U.S. 346, 357 (1997)

(noting that the Supreme Court has upheld civil detention, but only "provided the

confinement takes place pursuant to proper procedures and evidentiary standards");

*Rodriguez*, 804 F.3d at 1074-76 (citing cases). Consistent with this principle,

"[t]he Court's civil detention case law . . . emphasizes that due process requires

that the government bear the burden of proving the need for detention, at least

by. . . 'clear and convincing' evidence." [9] Anello, *supra*, at 378; *see also*

*Addington v. Texas*, 441 U.S. 418, 427, 433 (1979) (requiring clear and convincing

evidence in the context of civil commitment for the mentally ill). Why would due

process countenance a different standard here? I would require that the

government prove the necessity of a § 1226(c) detainee's continued detention by

clear and convincing evidence in order to justify a denial of bond.

The majority opinion identifies scant legal support for its proposition that the

government may continue to detain criminal aliens past the point when the

detention becomes unreasonably prolonged unless the aliens can demonstrate a

reason not to do so. Indeed, the majority opinion fails even to acknowledge that, in

placing the burden of proof on the detainee, it departs from the reasoned judgment

of every other circuit to have addressed the issue, two of which have adopted clear

---

[9] The Supreme Court has, however, adopted a lower burden of proof for relatively abbreviated detention. *See, e.g., Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) (requiring demonstration of probable cause for detention following arrest).

and convincing evidence as the appropriate burden of proof.[10]  *See Lora*, 804 F.3d at 616 ("[A] detainee must be admitted to bail unless the government establishes by clear and convincing evidence that the immigrant poses a risk of flight or a risk of danger to the community."); *Diop*, 656 F.3d at 233 ("[T]he Government bears the burden of proving that continued detention is necessary to fulfill the purposes of the detention statute."); *Singh v. Holder*, 638 F.3d 1196, 1203 (9th Cir. 2011) ("[T]he government must prove by clear and convincing evidence that an alien is a flight risk or a danger to the community to justify denial of bond . . . .").

A heavy burden of proof is particularly appropriate in the context of § 1226(c) for two reasons.  First, a § 1226(c) detainee will only receive a bond hearing after her detention has become unreasonably prolonged.  Thus, those

---

[10] Like other circuits that have considered the issue, the Sixth Circuit, in *Ly*, read an implicit limitation into § 1226(c), holding that the government may only detain a criminal alien without bond "for a reasonable period of time required to initiate and conclude removal proceedings promptly."  351 F.3d at 273.  But it did not explicitly address what burden of proof would apply to a bond hearing held for a § 1226(c) detainee.  *Id*.  The court did, however, intimate that the government should bear the burden of proving the necessity of continued detention, noting that "[w]hen actual removal is not reasonably foreseeable, deportable aliens may not be indefinitely detained without a government showing of a strong special justification." *Id.* (internal quotation marks omitted).

The First Circuit also has not addressed the burden of proof applicable to bond hearings provided to § 1226(c) detainees.  *See Reid*, 819 F.3d at 501.  The majority opinion asserts that in *Reid*, "the First Circuit summarily affirmed the district court's ruling that Reid was entitled to a bond hearing under the regulations effectuating § 1226(a)."  Maj. Op. at 44 n.11.  Presumably, the majority opinion is implying that the First Circuit would have agreed that § 1226(c) detainees should bear the burden of proof at bond hearings.  But the First Circuit explicitly declined to address the burden of proof question, noting that the district court had "examined the appropriate relief, which included a request by Reid that the court mandate certain procedural protections . . . that exceed those currently contemplated by regulations implementing bond hearings under 8 U.S.C. § 1226(a)" but that "Reid's personal situation [did] not warrant adjudication of these constitutional questions" because he had already been granted bond.  *Reid*, 819 F.3d at 501.

74

detainees who receive bond hearings will, by necessity, already have suffered a significant constitutional deprivation.[11] The severity of that deprivation counsels in favor of stronger procedural protections. *See Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

Second, placing the burden of proof on criminal aliens at bond hearings will likely leave many in detention unnecessarily. According to data provided by the American Civil Liberties Union, nearly 70% of the 1,680 bond hearings conducted in the Central District of California from October 2012 to April 2014 resulted in the alien's release.[12] This data suggests that mandatory detention under § 1226(c) results in the detention of many aliens who are unlikely to flee or pose a threat to other persons. Placing a heavier burden of proof on the government will help restrict § 1226(c)'s overly broad effect and ensure that only those aliens likely to abscond or present a public danger will remain in custody.

---

[11] Pursuant to the majority opinion's case-by-case approach, a court on habeas review would have to find a criminal alien's detention under § 1226(c) unreasonably prolonged before the alien could receive a bond hearing. Under the bright-line approach, the duration of an alien's detention would be unreasonable after six months and the alien would be entitled to a bond hearing at that time. In either case, the alien would receive a bond hearing only if her detention had been unreasonable in duration.

[12] I am particularly concerned that prolonged detention during the pendency of removal proceedings threatens to punish most severely those aliens with the strongest defenses to removal, since they are the least likely to expedite proceedings by stipulating to removal. Ironically, for the same reason these aliens have the least incentive to abscond during their removal proceedings. *See Reid*, 819 F.3d at 497 ("[T]he failure to adopt a bright-line rule may have the perverse effect of increasing detention times for those least likely to actually be removed at the conclusion of their proceedings.").

For its part, the majority opinion identifies three reasons why applying existing § 1226(a) regulations to § 1226(c) detainees satisfies due process requirements. First, the majority opinion notes that it "makes sense that, once the government can no longer constitutionally detain a criminal alien under [§ 1226(c)] without a bond hearing, the criminal alien's detention defaults to [§ 1226(a)]." Maj. Op. at 42. Although perhaps convenient, the fact that existing procedures governing the detention of a different class of alien detainees—who are not subject to mandatory detention—could conceivably be applied to § 1226(c) detainees says nothing about the constitutional adequacy of those procedures once a criminal alien's detention has become unreasonably prolonged.[13]

Second, the majority opinion states that applying existing regulations under § 1226(a) is consistent with the basic principle that courts should "afford agencies considerable deference in their policy realms." *Id.* at 43. But the choice we face here does not concern an agency's policy preferences; rather, it concerns how to interpret § 1226(c) in a manner consistent with constitutional principles. "We may

---

[13] The majority opinion also observes that criminal aliens who have been ordered removed and released on supervision are governed by regulations controlling the supervision of non-criminal aliens. This, the majority opinion reasons, is "further evidence that the statutes relating to non-criminal aliens provide the general rules for detention, and the statutes governing criminal aliens represent exceptions." Maj. Op. at 42 n.9. I do not disagree that § 1226(c) may fairly be interpreted as an exception to § 1226(a). Instead, I question how best to interpret § 1226(c) in a manner consistent with due process. The fact that it is possible to interpret § 1226(c) as an exception to § 1226(a) tells us nothing about whether the procedural protections afforded by regulations promulgated pursuant to § 1226(a) are constitutionally adequate as applied to unreasonably prolonged detention under § 1226(c).

not defer to [an agency's] regulations interpreting [a statute] . . . if they raise grave constitutional doubts."[14]  *Diouf v. Napolitano*, 634 F.3d 1081, 1090 (9th Cir. 2011); *accord Miller v. Johnson*, 515 U.S. 900, 923 (1995) (noting it is "inappropriate for a court engaged in constitutional scrutiny to accord deference to [an agency's] interpretation of [a statute]"); *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1249 (10th Cir. 2008) ("It is well established that the canon of constitutional avoidance does constrain an agency's discretion to interpret statutory ambiguities, even when *Chevron* deference would otherwise be due."); *Nat'l Mining Ass'n v. Kempthorne*, 512 F.3d 702, 711 (D.C. Cir. 2008) ("[The] canon of constitutional avoidance trumps *Chevron* deference, and we will not submit to an agency's interpretation of a statute if it presents serious constitutional difficulties." (citation and internal quotation marks omitted)).

The majority opinion's third—and most intuitively appealing—justification for its position is that shifting the burden of proof to the government for criminal aliens detained under § 1226(c) "would give criminal aliens a benefit that non-

---

[14] To support its claim that we should apply existing § 1226(a) regulations to § 1226(c) detainees, the majority opinion cites *Bureau of Alcohol, Tobacco and Firearms v. Federal Labor Relations Authority*, which states that "an agency acting within its authority to make policy choices consistent with the congressional mandate should receive considerable deference from courts." 464 U.S. 89, 98 n.8 (1983); Maj. Op. at 43.  But the majority opinion omits the tail-end of the quotation, which states that such deference is only appropriate when the agency's actions "conform to applicable procedural requirements and are not arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law." *Bureau of Alcohol, Tobacco & Firearms*, 464 U.S. at 98 n.8 (internal quotation marks omitted).  Consistent with this principle, because § 1226(a) regulations raise serious due process concerns when applied to § 1226(c) detainees, we are under no obligation to defer to them.

criminal aliens [detained under § 1226(a)] do not have."  Maj. Op. at 43.  But neither the Supreme Court nor this circuit has ever before addressed whether the regulations governing § 1226(a) detainees satisfy due process requirements.  And that question is not before us now.  As such, I cannot agree that a procedure created and used for § 1226(a) detainees tells us anything about the constitutional adequacy of the procedures governing unreasonably prolonged detention under § 1226(c).  Our decision regarding what due process requires in this context perhaps should bear upon the protections owed to § 1226(a) detainees, not the other way around.  Indeed, the Ninth Circuit, which has adopted a clear and convincing evidence standard for § 1226(c) detainees, appears to have adopted the same standard for § 1226(a) detainees.  *See Rodriguez*, 804 F.3d at 1087 (applying a clear and convincing evidence standard to a class comprised of aliens detained under § 1226(a) and (c)); *Singh*, 638 F.3d at 1205 (holding that "the clear and convincing evidence standard of proof applies in *Casas*[-*Castrillon*, 535 F.3d at 948, § 1226(a)] bond hearings").

      Significant deprivations of liberty warrant significant procedural protections.  Given the fundamental liberty interests at stake here, we should prohibit unreasonably prolonged detention under § 1226(c) unless the government can demonstrate by clear and convincing evidence that such detention is necessary.  The Due Process Clause requires nothing less.

### III.    Conclusion

"In our society liberty is the norm, and detention . . . the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).  Despite that promise, aliens detained pursuant to § 1226(c) are imprisoned for months, if not years, without bond hearings and based on the mere suspicion that they might abscond or commit future crimes.  Although the majority and I agree such stunning deprivation of liberty cannot, in all likelihood, withstand constitutional muster, the majority opinion nonetheless adopts an approach that threatens to arbitrarily deny these aliens the opportunity to contest their detention at a bond hearing.  And were some of these aliens able to win a hearing, the majority opinion would presume their continued detention acceptable unless they present persuasive evidence to the contrary.

I find such meager procedural protections plainly insufficient in the light of the fundamental liberty interests at stake.  I would adopt the Second and Ninth Circuits' bright-line approach and hold that, to avoid constitutional concerns, § 1226(c) detainees must be afforded a bond hearing after six months of detention and subsequently released unless the government establishes the necessity of their continued detention by clear and convincing evidence.  But I agree wholeheartedly with the majority that the government has detained Mr. Sopo for an unreasonably long time, and he must be given a bond hearing immediately.